| | | |
|---|---|---|
| ROBERT C. BATCHELOR and BRYAN L. BOTT, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| HOMETAP EQUITY PARTNERS, LLC,; HOMETAP HEI FUND IV SPV II, LLC,; and HOMETAP INVESTMENT PARTNERS II, L.P., | ) ) ) ) ) ) | |
| Defendants. | ) | |

NOW COMES Plaintiffs Robert Batchelor and Bryan Bott (collectively, "Plaintiffs"), by and through counsel, and submit this Complaint on behalf of themselves and all others similarly situated in North Carolina and pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek, on behalf of themselves and all others similarly situated, redress arising from a purported home equity "investment" contract they entered into with Defendant Hometap Equity Partners, LLC.

## INTRODUCTION

1. This action arises from Hometap's deceptive and predatory scheme to disguise high-cost home loans as home equity "investments."

2. Hometap advertises that a homeowner can receive an upfront cash payment in exchange for an "option" to purchase a percentage interest in the homeowner's home in the future.

3. While Hometap explicitly markets and states its product "is not a loan," the economic realities of the transaction dictate otherwise.

4. In practice, Hometap operates as a shadow lender, forcing homeowners to secure the transaction with a traditional Deed of Trust and Security Agreement that aggressively encumbers the property. Just like a standard mortgage lender, Hometap arms itself with a "Power of Sale," threatening vulnerable homeowners with nonjudicial foreclosure, loss of possession, and the appointment of a receiver if they fail to meet the company's strict, ongoing property obligations.

5. However, these contracts, although written in the form of an "Option Purchase Agreement" are mortgage loans that include deceptive disclosures, illegal fees, and exorbitant effective interest rates.

6. Additionally, Hometap's financial structure is designed to strip equity from homeowners through deceptive disclosures and exorbitant fees and effective interest rates. Hometap lures consumers in by offering an upfront lump sum of cash while immediately skimming thousands of dollars in "Investment Fees" and third-party closing costs off the top. Hometap then locks consumers into a convoluted "Option Purchase Agreement" where the company demands an annualized rate of return of up to 20%, which it misleadingly frames to the consumer as a protective "Hometap Cap."

7. Through this long, intricate agreement along with a striking lack of counseling offered to prospective customers, many homeowners who sign agreements with Hometap do not understand that there is an actual dollar amount that Hometap plans on collecting in the future.

8. Furthermore, Hometap's standard investment disclosures intentionally obscure the financial devastation of a default; the basic disclosure terms completely fail to explain that this 20% cap and the high "Hometap Percentage" will be weaponized against the homeowner to calculate a forced "Owner Repurchase" if they fall behind on their obligations.

2

9. Regardless of how Hometap characterizes its product, in substance it gives homeowners an upfront cash advance in exchange for a secured interest in their property, with repayment (plus interest) due within a specified term, most commonly ten years. In essence, this is a mortgage loan. Plaintiffs bring this action to safeguard themselves and others similarly situated to enforce their rights under both state and federal law.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) the proposed class consists of more than 100 members; (b) there is minimal diversity; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Complaint occurred in this District, where Plaintiff Batchelor resides and where the property that is the subject of his HEI contract is located.

## PARTIES

13. Plaintiff Bryan Bott is an adult individual and American consumer who resides at 9316 Ainslie Downs Street, Charlotte, North Carolina 28273.

14. Plaintiff Bryan Bott is a homeowner who entered into an Option Purchase Agreement with Hometap on or about May 28, 2024.

15. Plaintiff settled his debt with Hometap on or about September 5, 2025.

3

16. Plaintiff Robert Batchelor is an adult individual and American consumer who resides at 2727 Rosser Road, Bear Creek, North Carolina 27207.

17. Plaintiff Robert Batchelor is a homeowner who entered into an Option Purchase Agreement with Hometap on or about July 15, 2021.

18. Plaintiff Robert Batchelor settled his debt with Hometap on or about December 4, 2023.

19. Defendant Hometap Equity Partners, LLC ("HEP") is a Delaware Limited Liability Company with its principal offices located at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. HEP is the primary operating entity that facilitates its real estate transactions with consumers.

20. HEP controls the subsidiaries that are the contractual counterparties in transactions entered into by Hometap, such as Defendant Hometap HEI Fund IV SPV II, LLC ("HHEI") and Hometap Investment Partners II, L.P. ("HIP").

21. HHEI is a Delaware Limited Liability Company having an address at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. This entity serves as the secondary investor and assignee for Plaintiff Bott's home equity investment and is one of Hometap's special purpose vehicles to which Plaintiff Bott's Deed of Trust was assigned.

22. HIP is a Delaware Limited Partnership with its principal address located at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. HIP acted as the original investor and grantee on Plaintiff Batchelor's Deed of Trust and Option Purchase Agreement.

23. HEP, HHEI, and HIP are collectively referred to as "Hometap" herein.

24. At all relevant times, Defendants have engaged in the activities alleged herein in the State of North Carolina.

4

A. **Hometap's HEI Product Structure**

25.     Hometap's home equity investment ("HEI") contracts are labeled as Option Purchase Agreements, wherein the homeowner grants Hometap an "option" to purchase a percentage of the homeowner's future interest in the home in exchange for the "Investment Amount" paid immediately to the homeowner.

26.     At the top of the HEI contract, in bold and capitalized letters, is the following statement: "THIS IS NOT A LOAN." Directly below this statement, the contract states: "THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME."

27.     A true and accurate copy of Mr. Bott's Option Purchase Agreement is attached to this Complaint as **Exhibit A.** A true and accurate copy of Mr. Batchelor's Memorandum of Option Purchase Agreement is attached to this Complaint as **Exhibit B.**

28.     Hometap's HEI contracts share several defining characteristics. Pursuant to the agreement, Hometap purports to provide the homeowner with an upfront lump sum of cash broadly labeled as the "Investment Amount." Hometap typically conducts little to no meaningful credit review or assessment of the homeowner's ability to repay this amount before offering it. Although Hometap labels this payment the "Investment Amount," in substance it functions as the principal of a loan.

29.     Hometap calculates the actual cash disbursement provided to homeowners by immediately deducting its own "Investment Fees," various "Third-Party Costs" for appraisals and

5

title charges, and government taxes directly from the gross Investment Amount. The final, substantially reduced sum that is wired to the homeowner's bank account is explicitly defined in the HEI contracts as the "Net Investment Amount" or "Cash Due to Owner."

30. The HEI contracts provide that the standardized term of the "Investment" is ten years, although Hometap grants itself an exclusive right to extend this term for another ten (and possibly more) years at its sole discretion. The homeowner is not required to make any monthly or periodic payments throughout the "Investment Term," but at the end of the ten-year period, or upon any other event that triggers Hometap's right to exercise its option, the homeowner must make a single, large lump-sum payment to Hometap. In order to make this payment, homeowners are often forced to sell or refinance their home.

31. Under the terms of the HEI contracts, Hometap grants itself sweeping authority to "exercise" its option—effectively forcing a payout or the sale of the home—under a broad array of triggering events. The agreements authorize Hometap to claim its percentage interest not only upon the traditional sale or transfer of the property, or at the end of the ten-year term, but also upon the property's destruction, a government condemnation, any alleged "Event of Default," or even ambiguously "in anticipation of" the agreement's expiration date.

32. The HEI contracts contain an overly broad definition of "Event of Default" that allows Hometap to invoke default on pretextual grounds and thereby facilitate the stripping of homeowners' equity. The agreements dictate that a homeowner defaults not only for standard occurrences like bankruptcy or failing to pay property taxes, but also for highly subjective offenses, such as an alleged failure to maintain the property in "good repair" or the attachment of any unapproved lien.

33. Most egregiously, Hometap embeds a sweeping catch-all provision declaring a default upon the occurrence of *any* action or event that Hometap unilaterally claims has a "material adverse effect" on the property's value or Hometap's own financial share. By embedding these broadly drafted default provisions in the fine print, Hometap ensures that it has multiple avenues to invoke its remedies, strip homeowners of their equity, and further subject them to burdensome financial obligations.

34. When Hometap exercises its option, it legally acquires an ownership interest in the homeowner's home and thus has the right to foreclose or force sale of the home in order to collect its money.

35. The HEI contracts define the payout demanded from homeowners—whether upon a voluntary settlement or upon a forced exercise option—as the "Hometap Share," which is calculated by multiplying the property's final appraised "Ending Home Value" by a variable "Hometap Percentage" that scales aggressively upward (reaching as high as 15.957%) the longer the homeowner remains in the agreement.

36. Hometap also subjects this calculation to a so-called "Hometap Cap," dictating that the homeowner must pay the lesser of the calculated equity share or a 20% annualized rate of return on Hometap's original cash disbursement. Ultimately, this unclear calculation operates like an extremely high, variable interest rate, leaving vulnerable consumers on the hook for tens of thousands of dollars while being presented as so-called share equity investments.

**B. Hometap Requires Homeowners to Secure the "Investment" with a Deed of Trust**

37. To secure its purported "investment," Hometap requires the homeowner to execute a Deed of Trust and Security Agreement. Through this instrument, the homeowner grants Hometap

7

a security interest in their property, along with a power of sale that permits nonjudicial foreclosure in the event of a breach of the agreement.

38. A true and accurate copy of Mr. Bott's executed Deed of Trust and Security Agreement is attached to this Complaint as **Exhibit C.** A true and accurate copy of Mr. Batchelor's executed Deed of Trust and Security Agreement is attached to this Complaint as **Exhibit D.**

39. The Deed of Trust extends beyond securing an equity interest. It expressly encumbers the property to ensure payment of amounts that Hometap claims are owed, including liquidated damages, internal legal fees, and the reimbursement of various expenses. It also requires the homeowner to waive statutory homestead protections, thereby subordinating the homeowner's interest to Hometap's lien.

40. The agreement further imposes detailed covenants governing the homeowner's obligations. For example, it requires payment of property taxes and assessments in advance of delinquency. If the homeowner fails to comply, Hometap may pay those amounts, declare a default, and add the expenditures, along with associated fees, to the secured debt.

41. Additionally, the Security Agreement provides Hometap with broad remedies upon a declared "Event of Default." These include the ability to take possession of the property, seek the appointment of a receiver, and require the homeowner to make payments to remain in the home.

42. The agreement also authorizes Hometap, as the agent and attorney-in-fact, to act on the homeowner's behalf with respect to the property, including placing additional encumbrances or facilitating a sale. If Hometap proceeds with a foreclosure under its power of sale, the agreement provides for the deduction of a trustee's fee and other costs from the sale proceeds before any remaining funds are distributed to the homeowner.

8

### C. Bryan Bott Borrowed Money from Hometap

43.     On or about May 28, 2024, Mr. Bott entered into an Option Purchase Agreement with Hometap for his property located at 9316 Ainslie Downs Street, Charlotte, North Carolina 28273 ("Bott Property").

44.     Under the terms of Mr. Bott's Option Purchase Agreement, Hometap agreed to pay Mr. Bott an "Investment Amount" of $34,000.00. The "Beginning Home Value" of the Bott Property was determined by Hometap to be $426,144.00.

45.     From the $34,000 Investment Amount, Hometap deducted $2,304.00 in fees and costs, resulting in a "Net Investment Amount" paid to Mr. Bott of only $31,696.00. These fees and costs included: (a) an Investment Fee (paid to Hometap) of $1,020.00, (b) an Appraisal Fee of $299.00, (c) Title Charges totaling $895.00, (d) a Recording Fee of $64.00, and (e) an Assignment Fee of $26.00. The amount in fees that Hometap retained totaled $1,020.00.

46.     The Investment Fee of $1,020.00 charged by Hometap is approximately 3% of the Investment Amount and thus exceeds the statutory limits for fees on loans of this type under North Carolina law.

47.     Under the terms of Mr. Bott's Option Purchase Agreement, the Hometap Percentage is the percentage of the Property's value that Hometap is entitled to receive upon settlement. This percentage increases over time; for Mr. Bott's contract, the Hometap percentage was 11.968% for months 1-36, 14.186% for months 37-72, and 15.957% for months 73-120.

48.     According to the Agreement, when it came time to finish or "settle" Mr. Bott's agreement, Hometap would calculate two different numbers: the Hometap Share and the Hometap Cap. The Hometap Share represents the value of Hometap's interest in the Bott Property based on the Property's actual final value. It is calculated by multiplying the Hometap Percentage by the

9

ending home value. The Hometap Cap represents the 20% annualized rate of return on the Investment Amount.

49. The Option Purchase Agreement states that upon settlement, Mr. Bott will pay whichever of those two numbers is lower.

50. For example, if the Property appreciates at an annual rate of 2% and Mr. Bott settles the investment at the end of the 10-year term, the Hometap Share would be approximately $82,891.37. This represents more than 240% of the $34,000 Investment Amount and more than 260% of the $31,696 Net Investment Amount actually received by Mr. Bott.

51. In reality, however, this Hometap Cap operates to homeowners' detriment by functioning as a guaranteed 20% annualized rate of return on Hometap's initial investment amount. While Hometap represents that it will share in the risks of a property's depreciation, quarterly statements reveal otherwise. One of Mr. Bott's quarterly statements, for example, demonstrated that even when his home's value decreased from $426,144 to $423,125, Hometap abandoned the equity-share percentage calculation and instead utilized this 20% Hometap Cap to demand an inflated payout.

52. A true and accurate copy of this quarterly statement is attached to this Complaint as **Exhibit E.**

53. Mr. Bott signed his agreement with Hometap at a local Starbucks; he never met in person with any Hometap agent or representative. He recalls meeting only with a notary and receiving little to no explanation about what any of the documents were. When he signed the contract on May 28, 2024, only an agent from the title company ClearEdge was present. Mr. Bott had no opportunity to negotiate the terms of the contract.

10

54. Hometap required Mr. Bott to execute a Deed of Trust and Security Agreement that granted Hometap a security interest in the Bott Property. Mr. Bott's Deed of Trust included a "Power of Sale" clause, allowing the trustee to force a nonjudicial foreclosure sale if Mr. Bott defaults on obligations such as maintaining property insurance or paying property taxes.

55. Additionally, pursuant to the Deed of Trust, Mr. Bott assigned to Hometap all of his "right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the [Bott] Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to ownership, use, or occupancy of the [Bott] Property." In other words, Mr. Bott gave Hometap the rights to any money the Bott Property generates; if the Bott Property is rented out or otherwise produces income, Hometap has a claim to that money under the agreement.

56. Mr. Bott's Deed of Trust was subsequently assigned from Hometap Equity Partners, LLC to Hometap HEI Fund IV SPV II, LLC.

### D. Mr. Bott Settled his Hometap "Investment" on or about October 1, 2025

57. Mr. Bott formally requested to settle his "investment" with Hometap through a process called an "Owner Repurchase." In response, Hometap sent to Mr. Bott a "Hometap Owner Repurchase Settlement Statement" that demanded a payment of $42,761.41, assuming a settlement date of September 5, 2025. The Settlement Statement provided no explanation as to how Hometap calculated the required settlement payment.

58. A true and accurate copy of Mr. Bott's Hometap Owner Repurchase Settlement Statement is attached to this Complaint as **Exhibit F.**

11

59. The Settlement Statement also included a schedule showing that the required payment increased every day after September 5. According to this schedule, the payment would reach $43,385.36 by October 4, 2025.

60. Hometap instructed Mr. Bott to wire the required settlement funds to an account at East West Bank, and it specified that the receiving account belonged to Hometap HEI Fund IV SPV II, LLC.

61. Mr. Bott submitted his final payment, and Hometap sent a letter confirming that the Option Purchase Agreement was officially terminated effective October 1, 2025.

62. Once the funds were received, Hometap was obligated to release the liens associated with the investment. On October 7, 2025, an authorized representative for Hometap HEI Fund IV SPV II, LLC executed a Certificate of Satisfaction. This document was recorded with the county to formally discharge the Deed of Trust lien from Mr. Bott's property. A true and accurate copy of this Certificate of Satisfaction is attached to this Complaint as **Exhibit G.**

### E. Robert Batchelor Borrowed Money from Hometap

63. On or about July 15, 2021, Mr. Batchelor entered into an Option Purchase Agreement with Hometap for his property located at 2727 Rosser Road, Bear Creek, North Carolina 27207 ("Batchelor Property").

64. Under the terms of Mr. Batchelor's Option Purchase Agreement, Hometap agreed to pay Mr. Batchelor an "Investment Amount" of $18,000.00.

65. Hometap required Mr. Batchelor to execute a Deed of Trust and Security Agreement that granted Hometap a security interest in the Batchelor Property. Mr. Batchelor's Deed of Trust included a statutory "Power of Sale" clause, allowing the trustee to force a

12

nonjudicial foreclosure sale if Mr. Batchelor defaults on obligations such as maintaining property insurance or paying property taxes.

66.     Additionally, pursuant to the Deed of Trust (identical to Mr. Bott's Deed of Trust), Mr. Batchelor agreed to give Hometap the rights to any money the Batchelor property generates. If the Batchelor Property is rented out or otherwise produces income, Hometap has a claim to that money under the agreement.

**F.  Mr. Batchelor Settled his Hometap "Investment" in December 2023**

67.     Mr. Batchelor formally requested to settle his investment with Hometap through a process called an "Owner Repurchase." As was the response to Mr. Bott, Hometap sent to Mr. Batchelor a "Hometap Owner Repurchase Settlement Statement" that demanded a payment of $27,825.29, assuming a settlement date of December 9, 2023. The Settlement Statement indicated that this amount was only valid for a home value of $250,000.

68.     A true and accurate copy of Mr. Batchelor's Hometap Owner Repurchase Settlement Statement is attached to this Complaint as **Exhibit H.**

69.     The Settlement Statement also included a schedule showing that the required payment increased every day.

70.     Hometap instructed Mr. Batchelor to wire the required settlement funds to an account at Manufacturers & Traders Trust Co/Wilmington Trust, and it specified that the receiving account belonged to Hometap Investment Partners LL LP – Collection Account.

71.     Once the funds were received, Hometap was obligated to release the liens associated with Mr. Batchelor's investment. On December 7, 2023, an authorized representative for First American Title Insurance Company (acting as Attorney in Fact for Hometap) executed a Certificate of Satisfaction. This document was recorded with Chatham County on January 23,

13

2024, to formally discharge the Deed of Trust lien from Mr. Batchelor's property. A true and accurate copy of this Certificate of Satisfaction is attached to this Complaint as **Exhibit I.**

72.     Additionally, a Release of Memorandum of Option Purchase Agreement was executed on February 13, 2024, and filed with the county on February 14, 2024.

### G.  Hometap's Own Documentation Refers to its Transactions as Mortgage Loans

73.     Despite Hometap's bold, capitalized marketing claims that its product "IS NOT A LOAN," the company's own transaction documents explicitly classify the agreement as a traditional mortgage loan.

74.     The Borrower(s) Closing Statement for Mr. Bott's Hometap "Investment," for example, definitively categorizes Hometap's $34,000 disbursement under the heading "New Loans" and specifically identifies it as the "Loan Amount." This Closing Statement also assesses a government recording fee specifically for the "Mortgage."

75.     A true and accurate copy of this Borrower Closing Statement is attached to this Complaint as **Exhibit J.**

76.     This is further reinforced by the Limited Power of Attorney executed at closing, which explicitly identifies the homeowner as a "borrower" and states that the document is signed in consideration for the funding of their "mortgage loan." Importantly, this document also includes standard lending restrictions, prohibiting the settlement agent from altering the homeowner's "interest rate," the "term of the [homeowner's] loan," or the "outstanding principal balance."

77.     A true and accurate copy of Mr. Bott's executed Limited Power of Attorney is attached to this Complaint as **Exhibit K**.

78.     Additionally, the Marital Affidavit executed by Mr. Bott and attached to his Option Purchase Agreement explicitly identifies Hometap as "the lender." Hometap also requires the

14

homeowner to sign an Insurance Request form that updates their policy's "Mortgagee clause" to protect Hometap's interest. In its "Investment Disclosures" documents provided to the homeowner, Hometap requires the homeowner to name Hometap as "a loss payee/mortgagee."

79. Finally, when the homeowner pays to settle their Hometap Investment, Hometap's official Owner Repurchase Settlement Statement explicitly notes that the "Mortgage and Security Agreement" will be settled.

**H. Hometap Does Not Comply with North Carolina Consumer Lending Laws**

80. By deliberately mischaracterizing the transaction, Hometap attempts to strip homeowners of important statutory lending safeguards while retaining the strict enforcement mechanisms of a traditional debtor-creditor relationship.

81. Upon information and belief, at the time Plaintiffs entered into their respective agreements with Hometap, Hometap was not licensed to originate and/or make mortgage loans in North Carolina.

82. Regardless of how Hometap labels its product, it functions as a mortgage loan because Hometap provides homeowners with an advance of money, receives security through a Deed of Trust on the homeowner's home, and then requires repayment most often within ten years or less. These features, in the aggregate, create a mortgage loan.

83. While Hometap claims it is not guaranteed repayment, Hometap does ensure that, in practice, it will obtain repayment (plus interest) of its initial advance payment; all of Hometap's "Settlement Events" require the homeowners to pay Hometap.

84. Furthermore, the large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid (and make a profit) even if the

15

home drops dramatically in value. And that is without even accounting for the thousands of dollars in fees that Hometap requires at the outset.

85. Despite this guarantee, to further ensure that nothing will decrease the value of the home or jeopardize its future payment, Hometap requires homeowners to ensure that the home is maintained in "good repair" and pay for all the taxes, insurance, and repairs on the home. Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap Cure Payments," which themselves accrue interest at 8% and must be paid back.

### I. Hometap Unlawfully Attempts to Limit Consumer Rights

86. Hometap markets to individuals who need to pay off high-cost debt and who are less likely than the general population to be able to refinance their home at a later date.

87. Prior to signing a Hometap HEI contract, Hometap does not determine whether a homeowner can repay the Hometap HEI based on any documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though a failure to make these payments triggers the homeowner's repayment obligation.

88. Hometap further does not offer or require any counseling prior to inducing homeowners to sign their Option Purchase Agreements.

89. Hometap's only evaluation prior to entering into an HEI contract pertains to the homeowner's ability to repay through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

90. Hometap is a rapidly growing company that has entered into transactions with thousands of homeowners across multiple states.

16

**J. Hometap's Arbitration Provision is Unenforceable**

91. 15 U.S.C. § 1639c(e)(1) provides that no "residential mortgage loan and no extension of credit under an open-end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction." *See Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 187 (4th Cir. 2022) (holding that the statute "precludes pre-dispute agreements requiring the arbitration of claims related to residential mortgage loans").

92. The statute defines "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602.

93. Accordingly, because Hometap's transactions constitute residential mortgage loans secured by homeowners' dwellings, its arbitration provision is expressly prohibited by law and is thus void and unenforceable.

## <u>CLASS ALLEGATIONS</u>

94. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> All individuals who have entered into an Option Purchase Agreement with Hometap at a time when they were residents of North Carolina and/or where the property that is the subject of the Option Purchase Agreement was located in North Carolina and have settled their investment with Hometap.

17

95. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before or after the Court determines whether such certification is appropriate as discovery progresses.

96. **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the Class members are so numerous that joinder of all is impracticable. Upon information and belief based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements with North Carolina residents or for properties located in North Carolina.

97. **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. Fed. R. Civ. P. 23(a)(2), (b)(3). The common legal and factual questions include, among others:

    a. Whether Hometap's Option Purchase Agreements are mortgage loans;

    b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

    c. Whether Hometap violated North Carolina usury laws by charging interest rates and fees in excess of statutory limits;

    d. Whether Hometap violated the North Carolina Reverse Mortgage Statute;

    e. Whether Hometap violated the North Carolina Debt Collection Act;

    f. Whether Hometap violated North Carolina mortgage licensing requirements;

    g. Whether Hometap engaged in unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1;

    h. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

Case 1:26-cv-00515   Document 1   Filed 06/03/26   Page 18 of 37

i. Whether all consumers subject to Hometap's Option Purchase Agreements and who have since settled their Hometap investments are entitled to statutory, actual, and punitive damages; and

j. Whether Hometap acted willfully, intentionally, and/or recklessly in violating North Carolina's consumer lending laws.

98. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Fed. R. Civ. P. 23(a)(3). Plaintiffs, like all Class members, entered into a standard form Option Purchase Agreement with Hometap containing substantially similar terms and conditions. Plaintiffs' claims arise from the same course of conduct by Defendants and are based on the same legal theories as the claims of all Class members.

99. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class action litigation to represent himself and the Class.

100. **Predominance and Superiority.** Questions of law and fact common to the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of this controversy. Fed. R. Civ. P. 23(b)(3).

101. The statutory and punitive damages sought by each Class member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.

19

102. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if members of the Class themselves could afford such individual litigation, it would be an unnecessary burden to the courts.

103. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct.

104. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

105. All conditions precedent for filing this Complaint have been satisfied, occurred, or been met. Defendants are also barred by the doctrine of equitable estoppel or equitable tolling from alleging that this action is not timely or that any conditions precedent have not occurred or been met.

## CAUSES OF ACTION

### COUNT I
### Truth in Lending Act ("TILA")
### 15 U.S.C. § 1602 *et seq.*

106. Plaintiffs incorporate by reference each allegation set forth as if set forth at length herein.

107. Despite its representations to the contrary, Hometap's HEI product involves an extension of consumer credit as defined under TILA, 15 U.S.C. § 1635, and Regulation Z, 12 C.F.R. § 226.23.

108. As such, Hometap has violated TILA by failing to provide Plaintiffs with mandatory "material" disclosures prior to or at closing. Specifically, Hometap failed to issue a

20

compliant TILA disclosure that accurately outlined the loan's true finance charges and failed to disclose other essential credit terms. *See* 15 U.S.C. §§ 1635(i), 1638.

109. Furthermore, although the transaction functioned as the origination of a residential mortgage loan, upon information and belief, Hometap was not licensed to originate mortgage loans in North Carolina at the time the loans in question were originated.

110. In further violation of TILA, Hometap unlawfully embedded a mandatory arbitration provision within its contracts. *See* 15 U.S.C. § 1639(e).

111. Hometap also failed to make a reasonable and good faith determination that Plaintiffs had the ability to repay their individual "Investment Amount."

112. As a direct and proximate result of the aforementioned TILA violations, and pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiffs are entitled to the following damages:

    a. Rescission of their transactions;

    b. Termination of any security interest in Plaintiffs' properties created under the transaction;

    c. Return of any money or property given by Plaintiffs to anyone, including Hometap, in connection with these transactions;

    d. Actual and statutory damages; and

    e. An award of reasonable attorneys' fees and costs.

**COUNT II**
**North Carolina Usury Law**
**N.C. Gen. Stat. § 24-1 *et seq.***

113. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

21

114. Hometap's Option Purchase Agreement is, in substance, a loan secured by real property under North Carolina law. A "high-cost home loan" is defined as a loan other than a reverse mortgage loan in which (1) the principal amount of the loan does not exceed $300,000, (2) the borrower is a natural person, (3) the debt is primarily for personal, family, or household purposes; and (4) the loan is secured by either a security interest in borrower's principal dwelling or a mortgage or deed of trust on a home that does or will serve as the borrower's principal dwelling. N.C. Gen. Stat. § 24-1.1E(a)(4) (2025).

115. Under N.C. Gen. Stat. § 24-10(a), a lender making a "high-cost home loan," or a loan with a principal amount under $300,000 that is secured by real property cannot charge fees that exceed 1% of the principal amount of the loan.

116. Furthermore, N.C. Gen. Stat. § 24-10(g)(1) provides that for loans with a principal amount exceeding $25,000 that "are secured by a second or junior lien on real property," lenders may not charge fees that exceed 2% of the principal amount.

117. Hometap regularly charges an "Investment Fee" that is approximately 3% of the "Investment Amount." Hometap's "Investment Fee" charged to Mr. Bott, for example, was $1,020.00 on Mr. Bott's $34,000 Investment Amount. This 3% fee far exceeds the statutory limits.

118. Additionally, pursuant to N.C. Gen. Stat. § 24-1.1E(b)(2), "[n]o high-cost home loan may contain a scheduled payment that is more than twice as large as the average of earlier scheduled payments."

119. Mr. Bott's Hometap agreement, for example, requires a single lump-sum payoff to settle the Hometap Share at the end of the 10-year option (or upon sale of the Bott Property), with no prior scheduled monthly payments. This constitutes an illegal balloon payment in violation of the above-cited provision.

120. As a direct and proximate result of Defendants' violations of the aforementioned statutes, Plaintiffs have suffered damages, including the payment of unlawful fees.

121. Plaintiffs thus seek damages, costs, attorneys' fees, and such other relief as is equitable and just.

### COUNT III
**North Carolina Reverse Mortgage Act**
**N.C. Gen. Stat. Ch. 53, Art. 21**

122. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

123. Hometap's Option Purchase Agreement functions as a reverse mortgage under North Carolina law because it involves an advance of funds to homeowners secured by their residential property, with repayment deferred until the end of a specified term or upon the occurrence of certain triggering events. *See* N.C. Gen. Stat. § 53-257(6) (2025). North Carolina's Reverse Mortgage Act is designed to allow elderly homeowners to access the equity in their homes to meet their financial needs. *Id.* § 53-256 (2025).

124. Under N.C. Gen. Stat. § 53-270.1, a lender and borrower may agree that in addition to the principal and any interest accruing on the outstanding balance of a reverse mortgage loan, the lender may receive shared appreciation, but only if such shared appreciation "is in an amount not exceeding ten percent (10%) of the increase in the value of the property from the date of origination of the reverse mortgage loan to the date of loan repayment. . . ."

125. The Hometap agreement for Mr. Bott requires him to surrender a "Hometap Percentage" of anywhere from 11.968% to 20% of the ending home value to settle the investment. These percentages far exceed the 10% statutory maximum for shared appreciation under the North Carolina Reverse Mortgage Statute.

23

126. Additionally, N.C. Gen. Stat. § 53-270 lays out several prohibited practices in the offering and structuring of a reverse mortgage. The statute prohibits "[m]isrepresenting material facts, making false promises, or engaging in a course of misrepresentation through agents or otherwise" as well as "[e]ngaging in any action or practice that is unfair or deceptive." N.C. Gen. Stat. §§ 53-270(1), (4) (2025). The statute also prohibits closing a reverse mortgage loan without first receiving certification from a state-approved reverse mortgage counselor ensuring that the borrower was advised on the financial impacts and tax consequences of the transaction. *Id.* § 53-270(6) (2025).

127. There is no provision in the Hometap agreement that requires or provides this mandatory independent counseling. Furthermore, upon information and belief, Hometap did not require Plaintiffs to talk to an approved counselor nor did Hometap receive proof of Plaintiffs counseling prior to closing on its disguised reverse mortgage loans with Plaintiffs.

128. As a direct and proximate result of Defendants' violations of the North Carolina Reverse Mortgage Statute, Plaintiffs have suffered damages.

129. Plaintiffs are entitled to all remedies available under N.C. Gen. Stat. Ch. 53, Art. 21, including but not limited to damages, costs, attorney's fees, and such other relief as is equitable and just.

**COUNT IV**
**North Carolina Debt Collection Act**
**N.C. Gen. Stat. Ch. 75, Art. 2**

130. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

131. To the extent the "Settlement Amount" owed by Hometap consumers constitutes a debt as defined under North Carolina law, Hometap's practices in connection with the collection

24

of such amounts due violate the North Carolina Debt Collection Act ("NCDCA"). *See* N.C. Gen. Stat. § 75-50(2) (2025) (defining "debt" as "any obligation owed or due or alleged to be owed or due from a consumer").

132. To state a valid claim under the NCDCA, the plaintiff must establish, among other things, that the one owing the obligation is a consumer. *See Reid v. Ayers*, 138 N.C. App. 261, 263 (2000); *see also* N.C. Gen. Stat. § 75-50(1) (2025). The NCDCA defines "consumer" as "any natural person who has incurred a debt or alleged debt for personal, family, household or agricultural purposes." *Id.*

133. Plaintiffs satisfy the NCDCA definition of "consumer" because they, individually, used the money loaned to them by Hometap for personal, family, or household purposes.

134. Under N.C. Gen. Stat. § 75-54(4), a debt collector is prohibited from falsely representing the "character, extent, or amount of a debt against a consumer."

135. Hometap's persistent representation of the debt as an "investment" rather than a loan constitutes a deceptive representation of the debt's true character, in clear violation of this provision.

136. Additionally, pursuant to N.C. Gen. Stat. §§ 75-51(6) and (8), a debt collector may not threaten to take any action not permitted by law, nor represent that nonpayment will result in seizure, garnishment, attachment, or sale of any property unless such action is in fact contemplated and permitted by law.

137. The Hometap Deed of Trust asserts that upon an event of default, "Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take

25

possession of the Property or any part of it." Threatening this type of immediate, self-help seizure in the contract constitutes threatening an action not permitted by law.

138. Under N.C. Gen. Stat. § 75-55(2), it is an unconscionable debt collection practice to collect or attempt to collect "any interest or other charge, fee, or expense incidental to the principal debt unless legally entitled to such fee or charge."

139. Because the Hometap contract charges fees upfront that include, among others, a Hometap Investment Fee that exceeds the statutory limits for such fees under N.C. Gen. Stat. §§ 24-10(a) and 24-10(g)(1), attempting to collect these amounts constitutes an unconscionable debt collection practice.

140. As a direct and proximate result of Defendants' violations of the North Carolina Debt Collection Act, Plaintiffs have suffered damages.

141. Plaintiffs are thus entitled to all remedies available under N.C. Gen. Stat. Ch. 75, Art. 2, including actual damages, statutory penalties, and attorneys' fees.

**COUNT V**
**North Carolina Mortgage Law**
**N.C. Gen. Stat. Ch. 45**

142. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

143. Under N.C. Gen. Stat. § 45-36.7, a payoff statement provided by a secured creditor must contain specific financial disclosures, including "the amount by type of each fee, charge, or other sum included within the payoff amount" as well as "[t]he information reasonably necessary to calculate the payoff amount as of the requested payoff date, including the per diem interest amount." N.C. Gen. Stat. § 45-36.7(e)(1)-(2) (2025).

26

144. When Plaintiffs requested to settle their investment, Hometap provided an "Owner Repurchase Settlement Statement" that is in violation of these statutory requirements. For Mr. Bott, for example, the document demands a flat "Settlement Amount" of $42,761.41 and provides a table showing the total amount increasing each day, but it entirely fails to itemize the components of this payoff figure.

145. Hometap does not break down the original principal amount versus the accrued percentage annualized return (which functions as the interest on the loan), nor does it explicitly state the exact per diem interest amount or the specific formula used to calculate the daily schedule, as mandated by the statute.

146. As a direct and proximate result of Defendants' violations of the aforementioned provisions, Plaintiffs have suffered damages.

147. Plaintiffs are thus entitled to all remedies available under N.C. Gen. Stat. Ch. 45, including damages and attorneys' fees.

**COUNT VI**
**North Carolina Secure and Fair Enforcement ("SAFE") Mortgage Licensing Act**
**N.C. Gen. Stat. Ch. 53, Art. 19B**

148. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

149. North Carolina's SAFE Act is the state's mortgage licensing and conduct law, requiring anyone who originates residential mortgage loans in North Carolina to be properly licensed and to follow strict consumer protection rules. Specifically, the Act prohibits any company from engaging in the mortgage business—which includes advancing funds on residential mortgage loans for compensation or gain—without first obtaining and maintaining a proper license under Article 19B. N.C. Gen. Stat. § 53-244.040(a) (2025).

27

150. North Carolina law also requires anyone engaged in the mortgage business to clearly show their Nationwide Mortgage Licensing System ("NMLS") "unique identifier" on all residential mortgage loan applications, solicitations, advertisements, and other documents. N.C. Gen. Stat. § 53-244.107 (2025).

151. Upon information and belief, at the time Hometap entered into its agreements with Plaintiffs (May 2024 and July 2021), Hometap did not hold the proper license to engage in mortgage lending in North Carolina. Also upon information and belief, Hometap does not display any NMLS identifier on its documents because it claims not to be engaged in mortgage lending.

152. Furthermore, under N.C. Gen. Stat. § 53-244.111(5), it is unlawful for any person in a residential mortgage loan transaction to charge or collect any fee or rate of interest that is contrary to the limits set by Chapter 24.

153. Hometap charges fees and interest rates that exceed statutory limits under Chapter 24, as set forth in Count I above.

154. Additionally, under N.C. Gen. Stat. §§ 53-244.111(1) and (8), it is prohibited in any residential mortgage loan transaction to misrepresent or conceal material facts, or to engage in any course of business that is not in good faith or fair dealing, or that constitutes fraud upon any person.

155. Hometap's repeated representations that its HEI product is "not a loan" constitutes a misrepresentation or concealment of material facts in violation of this provision.

156. As a direct and proximate result of Defendants' violations of the NC SAFE Act, Plaintiffs have suffered damages.

157. Plaintiffs are thus entitled to all remedies available under the Act, including damages, penalties, and attorneys' fees.

28

**North Carolina Unfair and Deceptive Trade Practices ("UDTPA")**
**N.C. Gen. Stat. § 75-1.1**

158. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

159. N.C. Gen. Stat. § 75-1.1 prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

160. To assert a North Carolina UDTPA claim, a plaintiff must show that: "(1) the defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 195-96 (2014) (citation omitted); *see also* N.C. Gen. Stat. § 75-1.1 (2025). "A practice is properly deemed unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 196 (citation omitted).

161. Hometap has engaged in several unfair and deceptive trade practices, including but not limited to:

   a. Misrepresenting the HEI product as "not a loan" when it functions as a loan under North Carolina law;

   b. Attempting to enforce a contract that relies on a scheme in violation of North Carolina interest rate and fee limitations;

   c. Failing to comply with North Carolina usury laws, reverse mortgage statutes, debt collection laws, and mortgage licensing requirements, among others;

   d. Including misleading, confusing, and deceptive terms in its standard form contracts;

29

e. Requiring homeowners, including Plaintiffs, to waive substantial legal rights, including the right to a jury trial and the right to participate in class action litigation, without adequate disclosure; and

f. Marketing its product to vulnerable consumers without properly assessing their ability to repay.

162. Because Hometap operates a for-profit enterprise that exchanges capital for secured property interests and charges associated fees, Hometap's acts and practices constitute "business activities" that are in or affecting commerce under N.C. Gen. Stat. § 75-1.1.

163. As a direct and proximate result of Hometap's unfair and deceptive trade practices, Plaintiffs have suffered ascertainable losses and damages. Plaintiffs are thus entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16, as well as attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

**COUNT VIII**
**Declaratory Relief – Fee Shifting Provision Unenforceable**
**28 U.S.C. § 2201**

164. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

165. Plaintiffs' executed Deeds of Trust contain a broad and one-sided "Attorneys' Fees" provision that requires the homeowner to pay all costs, fees, and expenses incurred by Hometap in connection with interpreting, administering, or enforcing the agreement. This provision is not limited to litigation costs, but extends to any dispute-related expenses and in-house counsel disbursements.

166. Additionally, the Hometap Option Purchase Agreement also includes a provision that requires the homeowner to "pay any reasonable fees imposed or incurred by [Hometap] from

30

time to time related to the Option during the Effective Period." The provision explicitly states that the homeowner is required to pay any fees incurred in "any dispute relating to the Property."

167. These fee-shifting provisions are procedurally and substantively unconscionable, against public policy, and unenforceable. They are presented on a take-it-or-leave-it basis within adhesive consumer contracts and are designed to deter borrowers from vindicating their rights under consumer protection laws.

168. There exists an actual dispute between the parties concerning whether Plaintiffs would be responsible for paying Hometap's attorneys' fees in the event that Hometap prevails in the present action. A judicial declaration is necessary because the stakes are substantial; attorneys' fees in litigation of this nature routinely reach tens or hundreds of thousands of dollars.

169. Plaintiffs seek a declaration that this fee-shifting provision is unconscionable and unenforceable in this action.

**COUNT IX**
**Unconscionability**
**North Carolina Common Law**

170. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

171. As set forth herein, the Option Purchase Agreement and accompanying Deed of Trust together form an unconscionable contract of adhesion.

172. Hometap is a large financial company engaged in the business of soliciting homeowners and placing them into complex, equity-stripping agreements. Plaintiffs and Hometap occupied significantly unequal bargaining positions.

173. Hometap drafted all documents—including those with dense, complex legal and financial terms—and presented them to Plaintiffs on a "take it or leave it" basis, which constitutes

31

a contract of adhesion. Furthermore, Hometap provided no meaningful explanation of the documents to Plaintiffs; Plaintiffs were simply instructed to sign.

174. The terms of the Option Purchase Agreement and Deed of Trust are substantially one-sided in favor of Hometap. Hometap drafted the terms, such that they would guarantee Hometap a high rate of return at very limited risk, while placing an oppressive burden of costs and risks onto Plaintiffs. This unconscionability is evidenced by (including but not limited to) the following:

a. Structuring the transaction to ensure Hometap reaps massive profits while requiring Plaintiffs to bear all costs in order to protect and increase that profit, including the payment of all property taxes, insurance, and maintenance.

b. Granting Hometap an irrevocable Power of Attorney to unilaterally encumber the property with new loans, or sell and convey the entire interest in the property upon an alleged default.

c. Empowering Hometap to physically enter and take possession of the property without a court order upon an alleged default and demanding that Plaintiffs pay "Fair Rental Payments" to Hometap just to remain occupying their own home.

d. Forcing Plaintiffs to waive fundamental rights, including explicitly waiving all statutory homestead protections under North Carolina law and waiving the right to a jury trial or class action through a mandatory arbitration agreement.

e. Disguising an exorbitant, high-cost mortgage loan as a shared equity "Option" to circumvent and evade state and federal lending disclosures and consumer protection laws.

32

175. Because the transaction was unconscionable at the time it was made and induced by unconscionable conduct, Plaintiffs are entitled to, and respectfully request, all appropriate relief pursuant to the common law contract defense of unconscionability, including a declaration that the Option Purchase Agreement and Deed of Trust are void and unconscionable.

**COUNT X**
**Fraud in the Inducement**
**North Carolina Common Law**

176. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

177. Under North Carolina law, fraud in the inducement allows a party to challenge a contract's validity when fraudulent misrepresentations induce them to enter into the agreement.

178. Hometap made materially false representations with the intent to deceive Plaintiffs into signing the Option Purchase Agreement. Specifically, Hometap explicitly designed its primary contract to deceive Plaintiffs regarding the fundamental nature of the transaction. By misrepresenting to Plaintiffs that its HEI product was "not a loan," Hometap fraudulently induced Plaintiffs to believe that they were simply entering into a home-equity sharing option. Hometap also represented the transaction as a simple "Option Purchase Agreement," but secretly restricted Plaintiffs with the severe obligations and threats consistent with a traditional mortgage lender.

179. Additionally, Hometap fraudulently represented to Plaintiffs the true amount of money that they would receive. Hometap represented to Mr. Bott, for example, that his "Investment Amount" was $34,000. This, however, was a misleading representation of the actual cash benefit he would receive, as Mr. Bott's "Net Investment Amount" ended up being a meager $31,696.

33

180. Furthermore, Hometap's Investment Disclosures deceived Plaintiffs by framing its "Hometap Cap" feature as a consumer safeguard, stating: "The Hometap Cap protects you from extreme increases in the Hometap Share." In reality, this "Cap" operated to Plaintiffs' detriment by functioning as a guaranteed 20% annualized rate of return on Hometap's initial disbursement. For example, quarterly statements revealed that even when Mr. Bott's home depreciated in value, Hometap abandoned the equity-share percentage calculation and instead utilized the 20% Hometap Cap to demand an inflated payout.

181. As a result of these fraudulent misrepresentations, Plaintiffs justifiably relied on these representations to their detriment.

182. When fraud in the inducement is established, "the remedies are either to repudiate the contract or affirm the contract and recover damages caused by the fraud." *Collier v. Bryant*, 216 N.C. App. 419, 434 (2011) (citation omitted). However, "if rescission of the contract does not place the injured party *in statu quo*, as where he has suffered damages which cancellation of the contract cannot repair, there is no principle of law which prevents him from maintaining his action for damages caused by the other party's fraud." *Id.* (citation omitted).

183. As a direct and proximate result of Hometap's fraudulent misrepresentations, Plaintiffs have suffered ascertainable losses and damages. Plaintiffs are thus entitled to all remedies available under North Carolina law.

**COUNT XI**
**Unjust Enrichment**
**North Carolina Common Law**

184. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

34

185. Under North Carolina law, unjust enrichment is an equitable doctrine designed to prevent one party from being unjustly enriched at another's expense when no valid contract governs their relationship.

186. The economic benefits derived by Hometap are a direct and proximate result of Hometap's unlawful and inequitable acts, as alleged in this Complaint.

187. Plaintiffs are entitled to all remedies available under North Carolina law, including all payments made by Plaintiffs to Hometap resulting from inequitable and unlawful acts. It would be inequitable and unjust for Hometap to retain any portion of the charges, costs, principal, interest, and other costs resulting from Hometap's inequitable and unlawful acts.

## COUNT XII
### Declaratory Judgment
### 28 U.S.C. § 2201

188. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

189. An actual controversy exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other hand, concerning the legal characterization of Hometap's Option Purchase Agreements and the rights and obligations of the parties thereunder.

190. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and North Carolina law declaring that:

    a. Hometap's Option Purchase Agreements constitute mortgage loans under North Carolina law;

    b. Hometap's Option Purchase Agreements are subject to North Carolina usury laws and other consumer lending statutes;

c.  The interest rates and fees charged by Hometap exceed statutory limits and are thus unlawful; and

d.  The mandatory arbitration clause, class action waiver, and jury trial waiver in Hometap's contracts are unenforceable.

191.  A declaratory judgment is necessary and appropriate to determine the respective rights and obligations of the parties and to provide guidance for future conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class respectfully ask this Court to award judgment against Defendants as follows:

1.  Issue an Order certifying the Class as defined above, appointing Plaintiffs as the Class representatives, and designating Bryson Harris Suciu DeMay, PLLC, as Class counsel;

2.  Find that Defendants have committed the violations of law alleged herein;

3.  Issue an order awarding restitution and monetary damages to the Class;

4.  Issue an Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to rescinding, terminating, or voiding the contract;

5.  Render an award of compensatory damages, the exact amount of which is to be determined at trial;

6.  Render an award of treble damages;

7.  Render an award of punitive damages;

8.  Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

9.  Grant all other such relief as the court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand trial by jury as to all issues in the above matter.

Date: June 3, 2026.

BRYSON HARRIS SUCIU & DEMAY, PLLC

*/s/ Scott C. Harris*
Scott C. Harris
N.C. Bar No. 35328
900 W. Morgan Street
Raleigh, NC 27603
Tel:     919-600-5003
sharris@brysonpllc.com

Anne T. Regan *(to be admitted pro hac vice)*
HELLMUTH & JOHNSON, PLLC
8050 West 78th Street
Edina, Minnesota 55439
Tel:     952-941-4005
aregan@hjlawfirm.com

*Attorneys for Plaintiffs and Putative Class*

37