# EXHIBIT A

Investment No.: NC366392

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

# OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Equity Partners, LLC, a Delaware limited liability company with its principal offices at 75 Arlington Street, Suite 500, Boston, MA 02116 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS,** Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS,** the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS,** Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Security Agreement, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS**, as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentages, Hometap Share, and Investment Fee;

**WHEREAS**, as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS**, the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS**, the Investment Term Sheet is attached and made a part of this Agreement as <u>Schedule A</u>; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement, including any riders attached hereto;

(ii) the Investment Term Sheet;

(iii) a notarized Security Agreement in the form of a mortgage or deed of trust, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Security Instrument**");

(iv) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit C, which is attached and made a part of this Agreement; and

(v) a signed and completed Insurance Request and Authorization Form granting authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property.

(b) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(c) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement (**"Right to Cancel"**) by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the **"Cancellation Period"**) of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the **"Effective Date"**).

(d) For purposes of this Agreement, a **"Business Day"** shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instrument, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Signing Instructions with the appropriate property recorder's office or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instrument and any related documents.

Section 1.5 Option Period. The term of the Option (the **"Option Period"**) shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the **"Expiration Date"**); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an **"Extension Notice"**) of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the **"Extension Period"**, and the Option Period and any Extension Period collectively being the **"Effective Period"**), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The **"Ending Home Value"** shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined

below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet. The Hometap Share shall be calculated as of the date the Owner Repurchase or Hometap Option Exercise, as applicable, is effective, using the Hometap Percentage in effect on such date.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, only upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided*, *however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d);

(e) upon condemnation of the Property, as provided below in Section 6.1(h); or

(f) upon the mutual agreement of Hometap and Owner.

Section 2.5 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights

under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined above in Section 2.4(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.5. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.5. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instrument and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instrument. Owner will be responsible for all Transfer Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations, the payment or

performance of which is secured by a lien on the Property (such items being "**Senior Liens**"), including any loans or other obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available. Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the **"Transfer Closing"**) that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the **"Transfer Closing Notice"**) to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Transfer Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instrument.

(iv) Transfer Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes (**"Transfer Closing Costs"**) and all sales commissions (**"Sales Commissions"**). Transfer Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Transfer Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an **"Expiration Settlement"**), each implemented by delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.5 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Only upon the occurrence of any of the events identified in Section 2.4 above, Hometap shall have the right to exercise the Option as described in this Section 3.1. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise ("**Exercise Closing**"). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instrument upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Option Exercise by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.5 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount ("**Exercise Payment**"). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate property recorder's office or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Transfer Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.6(b)(i), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate property recorder's office or other applicable governmental, city, county, or municipal office in which the Property is situated a release and/or reconveyance of the Security Instrument, and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property; (b) default or notice of default with respect to any loan or other obligation secured by the Property;

(c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon

any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited liability company, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instrument, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an **"Acknowledged Pre-Existing Lien"**), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence (**"Owner Occupied"**) other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us

and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of

$25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing your requests for subordination; (ii) fees for processing your requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instrument or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Owner may not at any time increase, or permit the increase of, the total balance of loans or other property interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) in the Property below the dollar amount equal to the "**Minimum Owner Equity**", which is twenty percent (20%) of the current appraised value of the Property (the "**Current Property Value**"). "**Owner Equity**" shall be defined as the amount calculated by subtracting from the Current Property Value: (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans (as defined below), (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning

Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property.

(ii) Approved Subsequent Loans.

(1) In order for Hometap to consider any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans Used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.5. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap

Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

(k) Waiver of Right to Partition. Owner agrees to waive and relinquish all rights you may now or later have to seek partition of the Property, whether in kind or by sale.

Section 6.2 Hometap Rights and Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Hometap waives and relinquishes all rights it may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default by delivering to you a written notice (a "**Default Notice**") and may exercise any of the rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. Upon delivery of a Default Notice, we will have the right in our sole discretion to initiate and complete a Hometap Option Exercise in compliance with Section 3.1. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an actual or impending Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments ("**Hometap Cure Payments**"). We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, property and other taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure and Sale Under State Laws. We will be entitled to exercise our rights under the Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(c), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e) Owner Repurchase After Event of Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.5 above; *provided that* the Repurchase Settlement must (i) occur (A) within twenty (20) days

of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instrument and any foreclosure and sale or power of sale granted under the Security Instrument require specification of an amount in default or liquidated bid amount or we elect to exercise the power of sale or otherwise foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law, and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1 Indemnification by Owner and Maximum Liability. You agree to defend, indemnify, and hold us, and our successors or assigns, harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys'



Case 1:26-cv-00515-UA-JEP Document 13-1 Filed 08/11/26 Page 21 of 54

fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to: (a) a breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 Asset Administration. From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 Covenants to Run with Land. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Security Instrument reflecting this fact in the public records.

Section 8.4 Relationship. We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 Ongoing Credit Checks. By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Effective Period from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6 Multiple Owners. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the Notice Address, as defined below in Section 8.16; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the

Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement; (iii) executes a recordable addendum to the Security Instrument in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us (**"Exempted Owner Assignment"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section 8.9(b) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Transfer Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement.**" You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING

MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we

will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instrument is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

**HOMETAP**:

Hometap Equity Partners, LLC
75 Arlington Street, Suite 500
Boston, MA 02116
Attention: Legal Department
Email: homeowners@hometap.com

**OWNER**:

See signature page

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instrument, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you should marry or remarry or enter into a civil union or registered domestic partnership during the Effective Period, within thirty (30) days after the marriage, civil union, or domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must notify Hometap and execute any reasonably necessary documents to acknowledge your spouse or domestic partner's interest in the Property, this Agreement, and the Security Instrument, which may include a Consent of Spouse/Domestic Partner and/or joinder to this Agreement.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Security Instrument and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Security Instrument and this Agreement and all renewals, extensions and modifications of the Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Security Instrument, and all renewals, extensions and modifications of the Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP EQUITY PARTNERS, LLC**

By: ______________________

Name: Daniel Amato

Title: Authorized Signatory

Date: 05/28/2024

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: Bryan L. Bott
Bryan L. Bott

Date: 5/28/2024

Notice Address:
9316 Ainslie Downs Street, Charlotte, NC 28273

Acknowledgment Certificate

Mecklenburg County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: Bryan L. Bott.

Date: May 28, 2024

Official Signature of Notary

(Official Seal)

BEVERLY D NEWMAN
Notary Public - North Carolina
Mecklenburg County
My Commission Expires Aug 9, 2024

Beverly D. Newman, Notary Public
Notary's printed or typed name

My commission expires: 8/9/2024

**List of Schedules and Exhibits**

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Security Instrument
Exhibit C –Notice of Right to Cancel

## EXHIBIT A

**LEGAL DESCRIPTION**

Real property described as follows:

All that certain lot, parcel of land situated in the City of Charlotte, Mecklenburg County, North Carolina and more particularly described as follows:

BEING all of Lot 49 in HADLEY PART AT ARROWOOD STATION as same is shown on a map thereof recorded in Map Book 62, page 269 in the Mecklenburg Public Registry.

Parcel ID / APN: 20516847

## Schedule A: Hometap Investment Term Sheet

This document and the Option Purchase Agreement define key terms of the Option and Hometap's investment in the Property ("**Investment Terms**"). Capitalized terms are further defined in the Option Purchase Agreement.

Homeowner(s): Bryan L. Bott
Property Address: 9316 Ainslie Downs Street, Charlotte, NC 28273
Option ID: NC366392
Effective Date: 06/03/2024

**Section I: Predetermined Investment Terms**
Hometap and Owner agree to the Investment Terms defined below. These terms have the value assigned to them as shown below, and such values shall not change during the Option Period.

| Predetermined Investment Terms | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Amount | *Gross amount that Hometap will pay you to acquire an Option in the Property* | $34,000.00 |
| Net Investment Amount | *Net amount that you will receive after Investment Fees and Costs (see Section II below) have been deducted from the Investment Amount* | $31,696.00 |
| Beginning Home Value | *Property's value at the time of Investment Signing, determined by Appraisal* | $426,144.00 |
| Hometap Percentage (if Ending Home Value ≥ Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value; used to determine Option's value* | |
| | *Months 1-36, ending 2027-06-03* | 11.968% |
| | *Months 37-72, ending 2030-06-03* | 14.186% |
| | *Months 73-120, ending 06/03/2034* | 15.957% |
| Hometap Percentage (if Ending Home Value < Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is less than the Beginning Home Value; used to determine Option's value* | 11.968% |
| Acknowledged Pre-Existing Liens | *Current sum of debt obligations secured by a lien on the Property*<br>*Mr. Cooper, $208,029.90*<br>*Signature Federal Credit Union, $106,940.91* | $314,970.81 |

**Section II: Investment Fees and Costs**
Hometap and Owner agree to the Investment Fees and Costs defined below. The Investment Fees and Costs have the value assigned to them as shown below, which shall be deducted from the Investment Amount to determine the Net Investment Amount. The Net Investment Amount shall be paid to the Owner, as further provided in the Option Purchase Agreement.

| Investment Fees and Costs<br>Deducted from Investment Amount | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Fee | *Investment fee charged by Hometap* | $1,020.00 |
| Third-Party Costs | *Costs incurred for third-party processing and services related to finalizing the Investment and signing the Investment Documents, or costs for third-party products*<br>*Appraisal, $299.00*<br>*Title Charges, $895.00* | $1,194.00 |
| Government Taxes and Fees | *Taxes and fees assessed by government entities related to finalizing the Investment and signing the Investment Documents*<br>*Recording Fee, $64.00*<br>*Assignment Fee, $26.00* | $90.00 |
| Payoffs | *Amounts paid at time of Signing to lien holders or creditors, on Owner's behalf, to pay down Owner's total amount of liens or debt* | $0.00 |
| Total Investment Fees and Costs | *Total of amounts listed in this table, to be deducted from the Investment Amount to determine the Net Investment Amount* | $2,304.00 |

**Section III: Investment Terms Valued at Time of Option Exercise or Repurchase**
Hometap and Owner agree to the Investment Terms defined below. The value of the Investment Terms in this Section III cannot be determined until the Owner repurchases or Hometap exercises the Option. Hometap and Owner agree that the value of the Investment Terms in this Section III shall be determined or calculated as stated herein and as further provided in the Option Purchase Agreement. Sample calculations of the Investment Terms in this Section III have been provided to Owner in the Investment Disclosures.

| Investment Terms Valued at Time of Option Exercise or Repurchase | |
|---|---|
| **Term** | **Definition** |
| Ending Home Value | *Property's value at the time of Option exercise or repurchase, determined by Appraisal or Permitted Sale* |

| | |
|---|---|
| Hometap Cap | *Maximum 20% annualized rate of return on the Investment Amount, prorated for a partial year, as applied to the Hometap Share, calculated as:* $$(Investment\ Amount) * 1.2\hat{}(\frac{days\ since\ Effective\ Date}{365})$$ *Using the Investment Terms, the calculation is:* *$34,000.00 * 1.2^((days since 06/03/2024 / 365)* |
| Hometap Share | *Value of Hometap's Option, calculated by multiplying the Ending Home Value by the Hometap Percentage; the maximum value of the Hometap Share is the Hometap Cap* |

I acknowledge and agree that the Investment Terms defined in this Schedule A shall apply to the Option, as further described in the Option Purchase Agreement.

Bryan L. Bott

Bryan L. Bott

5/28/2024

Date

# NORTH CAROLINA RIDER

This NORTH CAROLINA RIDER (the "**Rider**") is made as of the date below and is incorporated into and shall be deemed to amend and supplement the Option Purchase Agreement (the "**Agreement**") of the same date entered into between the undersigned (the "**Owner**") and Hometap Equity Partners, LLC ("**Hometap**") and covering the Property described in the Agreement and located at 9316 Ainslie Downs Street, Charlotte, NC 28273. Capitalized terms not defined in this Rider have the meanings provided in the Agreement.

In addition to the representations, warranties, covenants, and agreements made in the Agreement, Owner and Hometap further agree as follows:

1. Section 8.13 of the Agreement is deleted and replaced by the following:

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(k) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement**." You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(l) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(m) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of**

**Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(n) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(o) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(p) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(q) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator will be strictly confidential for the benefit of all parties.

(r) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified.

(s) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

This Rider shall not amend, modify, or supplement any other terms or language of the Option Purchase Agreement or any other documents executed and entered into between Owner and Hometap.

BY SIGNING BELOW, Owner accepts and agrees to the terms and covenants contained in this Rider.

**OWNER(S):**

By: [signature]
Bryan L. Bott

Date: 5/28/2024

## EXHIBIT C

## NOTICE OF RIGHT TO CANCEL

**HOMEOWNER(S): Bryan L. Bott** **DATE: 05/28/2024**

**ADDRESS: 9316 Ainslie Downs Street, Charlotte, NC 28273**

**INVESTMENT NO.: NC366392**

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a security interest in your home. You have a right to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) The date of this transaction, which is **05/28/2024**; or
(2) The date you received your Investment Term Sheet; or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Hometap Equity Partners, LLC
75 Arlington Street, Suite 500
Boston, MA 02116
Fax: 1-617-830-9395 / email: withdraw@hometap.com

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. You may notify us of your intention to cancel by email at withdraw@hometap.com, but we may require you to confirm in writing. Keep one copy of this notice because it contains important information about your rights.

If you cancel by email, you must send the notice no later than 11:59 PM ET of **05/31/2024**. If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

____________________ ____________________

Bryan L. Bott

**By signing this notice, I acknowledge that I have RECEIVED this Notice of Right to Cancel:**

[signature] 5/28/2024

Bryan L. Bott

*After Recording Return To:*
Hometap Equity Partners, LLC
75 Arlington Street
Suite 500
Boston, MA 02116

***Recording Requested By:***
*Hometap Equity Partners, LLC*
Investment No.: NC366392

***Prepared By:***
Daniel Amato
Hometap Equity Partners, LLC
75 Arlington Street, Suite 500
Boston, MA 02116

Parcel ID: 20516847

C-NC887617

________________**[Space Above This Line For Recording Data]**________________

**Investment Amount:** **$34,000.00**

**DEED OF TRUST AND SECURITY AGREEMENT**

This DEED OF TRUST AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 05/28/2024 ("**Signing Date**"), by and among Bryan L. Bott (the "**Owner/Grantor**"), ClearEdge Title ("**Trustee**"), and Hometap Equity Partners, LLC, a Delaware limited liability company, and its successors and assigns ("**Hometap/Beneficiary**"). This Deed of Trust and Security Agreement was prepared by Daniel Amato, with an address of: c/o Hometap, 75 Arlington Street, Suite 500, Boston, MA 02116.

**RECITALS**

A. This Security Instrument is given in connection with the execution of the Option Purchase Agreement by and between Owner and Hometap (the "**Option Agreement**") of even date, by which Owner grants and conveys to Beneficiary the option to purchase an undivided percentage interest in that certain real property and improvements thereof located at 9316 Ainslie Downs Street, Charlotte, NC 28273 and further described on Exhibit A attached hereto (the "**Property**").

B. Beneficiary desires to secure the rights granted to it in the Option Agreement and the performance of the Obligations (as defined below).

C. This Security Instrument is given pursuant to the Option Agreement, and payment fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument- in accordance with the terms set forth herein.

D. Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Agreement. The Option Agreement and this Security Instrument are collectively referred to as the **"Hometap Homeowner Agreement."**

**TERMS**

1. Grant. OWNER HEREBY IRREVOCABLY AND UNCONDITIONALLY grants and conveys to Trustee, and its successors and assigns, in trust, a security interest, with POWER OF SALE, for the benefit of Beneficiary, as beneficiary, and its successors and assigns, in and to the Property, to have and to hold the Property unto Trustee and Trustee's successors and assigns forever, together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

OWNER COVENANTS that Owner is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Owner warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

PROVIDED, HOWEVER, these presents are upon the express condition that, if Owner shall well and truly (a) pay to Beneficiary the Hometap Share at the time and in the manner provided in the Option Agreement, this Security Instrument, and the other Investment Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, these presents and the estate hereby granted shall cease, terminate, and be void; *provided, however*, that Owner's obligation to indemnify and hold harmless Beneficiary pursuant to the provisions hereof shall survive any such payment and release.

2. Secured Obligations. Owner makes the grant and conveyance set forth in Section 1 to secure the following:

(a) Owner's performance of each of its obligations in the Option Agreement;

(b) Beneficiary's rights under the Option Agreement;

(c) Owner's payment obligations in the Option Agreement, including:

(i) Payment of the Hometap Share owed to Beneficiary pursuant to the terms of the Option Agreement;

(ii) Payment of all Option Fees owed to Beneficiary pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Beneficiary pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Beneficiary pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the liquidated damages pursuant to Section 7.4 of the Option Agreement;

(vi) Reimbursement of any expenditures made by Beneficiary pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel) (collectively, "**Legal Fees**") incurred by Beneficiary in the enforcement and collection of the obligations listed above and the protection of Beneficiary's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a fixture filing financing statement and security agreement under the North Carolina Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the North Carolina Commercial Code. Owner grants to Beneficiary a security interest in those items to secure the performance and payment of the Obligations.

(a) Owner agrees that Beneficiary may file this Security Instrument, or a copy of it, in the real estate records or other appropriate index and/or in the Office of the Secretary of State of North Carolina, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 25-9-501(a)(1) and 25-9-502(c) of the North Carolina Commercial Code, and any similar or successor provisions.

(c) Beneficiary may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d) Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Beneficiary may require.

(e) Upon an Event of Default, Beneficiary will have the remedies of a secured party under the North Carolina Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Beneficiary may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Beneficiary's remedies under the North Carolina Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Owner absolutely and unconditionally assigns to Beneficiary all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income,

revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Owner gives to and confers upon Beneficiary the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Hometap may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5. Covenants of Owner Regarding the Property. Owner agrees as follows:

(a) To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Beneficiary; and to pay all costs, fees, and expenses of Beneficiary (including cost of evidence of title, Trustee's fees, and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Beneficiary may appear, and in any action, suit, or proceeding brought by Beneficiary to foreclose this Security Instrument or to collect the Obligations or to protect Beneficiary's rights under this Security Instrument or the Option Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i) If Owner fails to make any payment or to do any act as provided in this Security Instrument, Beneficiary may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Beneficiary will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii) Beneficiary will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Beneficiary under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Beneficiary appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Beneficiary related to this Security Instrument and to pay interest on any of such amounts demanded by Beneficiary at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Owner irrevocably appoints Hometap as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Beneficiary may, in Beneficiary's name or in the name of Owner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Beneficiary's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Beneficiary may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Hometap as agent and attorney-in-fact will be accountable only for such funds as are actually received by Hometap.

7. Default and Foreclosure. Upon an Event of Default, Beneficiary may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner of a written declaration of default. If any Event of Default has occurred and is continuing, Hometap may take any or all of the following actions, at the same or at different times:

(a) Possession. Beneficiary may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Hometap is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Beneficiary, then this Security Instrument will, at the option of Beneficiary, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Beneficiary may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Beneficiary the amount of rent requested by Hometap in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Beneficiary may apply on account of the unsatisfied Obligations owed to Beneficiary after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Beneficiary that were paid by Owner to Beneficiary or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e) Remedies at Law or Equity. Beneficiary may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Statutory Power of Sale. To the extent permitted by applicable law:

(i) Beneficiary will have the power to sell the Property at a nonjudicial foreclosure sale. In connection with the sale, Beneficiary may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default. Beneficiary will give notice of default to Owner prior to acceleration following an Event of Default. The notice will specify: (A) the default; (B) the action required to cure the Event of Default; (C) a date by which the Event of Default must be cured; and (D) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument and sale of the Property. The notice will further inform Owner of any right to cure after acceleration and the right to assert in the foreclosure proceeding the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Beneficiary at its option may require immediate performance in full of all Obligations without further demand and may invoke the power of sale and any other available remedies not prohibited by applicable law. Beneficiary will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including reasonable attorneys' fees, Trustee's fees, and costs of title evidence.

(ii) If Beneficiary invokes the power of sale, and if it is determined in a hearing held in accordance with applicable law that Trustee can proceed to sale, Trustee will take such action regarding notice of sale and will give such notices to Owner and to other persons as applicable law may require.

(iii) After the time required by applicable law and after publication of the notice of sale, Trustee, without demand on Owner, will sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.

(iv) Trustee will deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in such deed of any matters or facts will be conclusive proof of their truthfulness. Any person, including Owner or Beneficiary, may purchase the Property at any sale.

(v) After deducting all costs, fees, and expenses (including Legal Fees, Trustee's fees of 5% of the gross sale price, and cost of evidence of title in connection with the sale), Trustee will apply the proceeds of the sale to payment of: first, to all sums expended under the terms of this Security Instrument, not then repaid, with accrued interest, if any, at the amount allowed by applicable law in effect on the Signing Date of this Security Instrument; second, to other sums then secured by this Security Instrument and senior to Beneficiary's interest; third, the

Hometap Share to Beneficiary; and fourth, the remainder, if any, to the person or persons legally entitled to it.

(vi) Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(vii) Exercise of Beneficiary's remedies under this Security Instrument will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Beneficiary does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Beneficiary's Powers. At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations, Beneficiary may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The terms "**Hometap**" or "**Beneficiary**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument. Absent Beneficiary's prior written consent, which consent may be withheld in its sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

11. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

12. Joint and Several Liability. If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

13. Multiple Owners. If there are multiple Owners of the Property:

(a) this Security Instrument must be signed by each Owner;

(b) all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c) each Owner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e) Beneficiary may treat any notice received from any Owner as notice from all Owners.

14. Incorporation by Reference. Exhibit A to this Security Instrument is incorporated by this reference.

15. Extent of Lien. The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

16. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Beneficiary otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Beneficiary after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Beneficiary or in any other person.

17. Release. Following payment of all amounts secured by this Security Instrument, Beneficiary or Trustee will cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all contracts evidencing debt or Obligations secured by this Security Instrument will be surrendered to Trustee. Owner will pay any recordation costs. Beneficiary may charge Owner a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

18. Subordination of Homestead and Waivers. If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Beneficiary under the Option Agreement and all renewals, extensions, and modifications of the Option Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument. Owner waives and relinquishes all rights of curtesy and dower in the Property.

19. Substitute Trustee. In accordance with applicable law, Beneficiary may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee will succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

20. Notice of Option Purchase Agreement. Owner hereby provides notice that Owner and Beneficiary have entered into the Option Agreement, as more particularly described in Exhibit B attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Beneficiary. The Option Agreement is irrevocable by Owner and expires on 06/03/2034. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

21. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Grantee:**

Hometap Equity Partners, LLC
75 Arlington Street, Suite 500
Boston, MA 02116
Attention: Legal Department

**Owner/Grantor:**

Bryan L. Bott
9316 Ainslie Downs Street
Charlotte, NC 28273

**Trustee:**

ClearEdge Title
2605 East Enterprise Rd, Suite 270
Clearwater, FL 33759

22. Future Advances. This Security Instrument is given wholly or partly to secure future advances and/or future obligations that may be made or incurred under this Security Instrument or the Option Agreement. The maximum principal amount that may be secured by the Security Instrument solely related to future advances and/or future obligations at any one time is $34,000.00. Any additional amounts advanced by Beneficiary pursuant to the provisions of this Security Instrument or the Option Agreement shall be deemed necessary expenditures for the protection of the security. The period within which future advances may be made and future obligations may be incurred, is the period between the date hereof and the date ten (10) years from the date of this Security Instrument. All future advances and future obligations shall be considered to be made or incurred pursuant to the requirements of North Carolina General Statutes Section 45-67, et seq., and any amendments thereto.

23. Attorneys' Fees. Any provisions of this Security Instrument or any other Investment Document providing for the payment of "attorneys' fees," "reasonable attorneys' fees," or other words or provisions of similar import, shall mean, with respect to Beneficiary, the reasonable expenses of such person actually incurred at its counsels' customary hourly rates to enforce or collect any portion of the Obligations including, without limitation, reasonable arbitration, paralegals', attorneys', and experts' fees and expenses whether incurred without the commencement of a suit, in any trial, arbitration, or administrative proceeding or in any appellate or bankruptcy proceeding. Any determination of attorneys' fees owed hereunder shall be computed without regard to North Carolina General Statutes Section 6-21.2 or any other statutory presumption. The provisions of North Carolina General Statutes Section 45-45.1, and any similar statute enacted in replacement or substitution thereof, are hereby waived by Owner and shall be inapplicable to this Security Instrument and the other Investment Documents.

*[Signature Pages Follow]*

**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC, AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH HOMETAP, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND THE INVESTMENT DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN OWNER AND BENEFICIARY AS OF THE EFFECTIVE DATE.**

**OWNER DECLARES THAT OWNER HAS READ THIS DEED OF TRUST AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 21 above.**

IN WITNESS WHEREOF, each undersigned Grantor has executed this Deed of Trust and Security Agreement under seal as of the Signing Date.

**GRANTORS:**

By: Bryan L. Bott
Bryan L. Bott

Date: 5/28/2024

Acknowledgment Certificate

Mecklenburg County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document: Bryan L. Bott.

Date: May 28, 2024

(Official Seal)

BEVERLY D NEWMAN
Notary Public - North Carolina
Mecklenburg County
My Commission Expires Aug 9, 2024

Official Signature of Notary

Beverly D. Newman, Notary Public
Notary's printed or typed name

My commission expires: 8/9/2024

## EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain lot, parcel of land situated in the City of Charlotte, Mecklenburg County, North Carolina and more particularly described as follows:

BEING all of Lot 49 in HADLEY PART AT ARROWOOD STATION as same is shown on a map thereof recorded in Map Book 62, page 269 in the Mecklenburg Public Registry.

Parcel ID / APN: 20516847

## EXHIBIT B

## NOTICE OF OPTION

This Notice of Option ("**Option Notice**") provides notice of the Option Purchase Agreement entered into as of 05/28/2024 ("**Signing Date**"), by and between Bryan L. Bott and Hometap ("**Option Agreement**"), and supplements the Security Instrument of the same date between the parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

## RECITALS

A. Owner hereby declares that as of the Signing Date, Owner and Beneficiary have entered into that certain unrecorded Option Agreement, which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Owner grants and conveys to Beneficiary the option to purchase an undivided percentage interest of fee simple title ownership in and to the Property. In consideration for granting and conveying the Option to Beneficiary, Beneficiary paid to Owner the Investment Amount. The Option is irrevocable by Owner and expires on 06/03/2034.

B. In the Option Agreement, Owner has made certain covenants and promises to, or for the benefit of, Beneficiary in connection with the Option and the Property, all as more particularly described in and on the terms and conditions stated in the Option Agreement.

C. Owner has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Owner as to the Beneficiary, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Owner's interest in the Property, so long as the Option Agreement has not expired or been terminated.

## TERMS

1. Notice. Every person or entity who now or later owns or acquires any right, title, or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right, and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such restrictions, provisions, covenants, rights, and limitations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

2. Covenants. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

(a) Restrictions on Owner's right to transfer the Property without giving proper written notice to Beneficiary and requirements that Owner comply with specific sale procedures set forth in the Option Agreement;

(b) Requirements that Owner maintain insurance on the Property against certain hazards and risks;

(c) Restrictions on Owner's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;

(d) Restrictions on the Owner's ability to rent the Property;

(e) Requirements that Owner keep Property free of liens not approved by Beneficiary; and

(f) Requirements that Owner protect and maintain the Property.