**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**CASE NO.: 1:26-cv-00515-UA-JEP**

| | |
|---|---|
| BRYAN L. BOTT, ROBERT C. BATCHELOR, EDWARD ARNOLD, and JESSICA ARNOLD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HOMETAP EQUITY PARTNERS, LLC; HOMETAP HEI FUND IV SPV II, LLC; and HOMETAP INVESTMENT PARTNERS II, L.P.,<br><br>Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

NOW COME Plaintiffs Bryan Bott, Robert Batchelor, Edward Arnold, and Jessica Arnold (collectively, "Plaintiffs"), by and through counsel, and, pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure and upon the consent of Defendants' counsel, submit this Amended Complaint on behalf of themselves and all others similarly situated in North Carolina and pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek, on behalf of themselves and all others similarly situated, redress arising from purported home equity "investment" contracts they entered into with Defendants Hometap Equity Partners, LLC; Hometap HEI Fund IV SPV II, LLC; and Hometap Investment Partners II, L.P. (collectively "Hometap" or "Defendants").

## INTRODUCTION

1. This action arises from Hometap's deceptive and predatory scheme to disguise high-cost home loans as home equity "investments."

2. Hometap advertises that a homeowner can receive an upfront cash payment in exchange for an "option" to purchase a percentage interest in the homeowner's home in the future.

3. While Hometap explicitly markets and states its product "is not a loan," the economic realities of the transaction dictate otherwise.

4. In practice, Defendants operate as a shadow lender, forcing homeowners to secure the transaction with a traditional, form Deed of Trust and Security Agreement that aggressively encumbers the property. Like standard mortgage lenders, Hometap arms itself with a "Power of Sale," threatening vulnerable homeowners with nonjudicial foreclosure, loss of possession, and the appointment of a receiver if they fail to meet Hometap's strict, ongoing, and often illusive property obligations.

5. These form contracts, although written in the form of an "Option Purchase Agreement," are actually mortgage loans. This financial structure is designed to strip equity from homeowners through deceptive disclosures, illegal fees, and exorbitant effective interest rates. Hometap lures consumers into its web by offering an upfront lump sum of cash, while it immediately skims thousands of dollars in "Investment Fees" and closing costs off the top of the total loan amount. Hometap then locks consumers into a convoluted "Option Purchase Agreement" where it demands an annualized rate of return of up to 20%, which it misleadingly frames to the consumer as a protective "Hometap Cap."

6. Through this long, intricate set of form agreements and with a striking lack of counseling offered to prospective customers, many Hometap borrowers do not understand the true nature of the transaction or the actual dollar amount that Hometap plans on collecting from them in the future.

7. Furthermore, Hometap's standard form investment disclosures intentionally obscure the explanation that this 20% cap and the high "Hometap Percentage" will be weaponized against the homeowner to calculate a forced "Owner Repurchase" if they fall behind on their obligations.

8. Regardless of how Hometap characterizes its product, in substance it gives homeowners an upfront cash advance in exchange for a secured interest in their property, with repayment (plus interest) due within a specified term, most commonly ten years. In essence, this is a mortgage loan. Plaintiffs bring this action to safeguard themselves and others similarly situated and to enforce their rights under both state and federal law.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) the proposed class consists of more than 100 members; (b) there is minimal diversity; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that establish this Amended Complaint occurred in this District, where Plaintiff Robert Batchelor resides and where the property that is the subject of his HEI contract is located.

## PARTIES

12. Plaintiff Bryan Bott is an adult individual and American consumer who resides at 2931 Audubon Ridge Drive, Belmont, North Carolina 28012.

13. In May 2024, Plaintiff Bryan Bott was a homeowner who resided at 9316 Ainslie Downs Street, Charlotte, North Carolina 28273. He entered into an Option Purchase Agreement with Hometap on or about May 28, 2024.

14. Plaintiff Bryan Bott settled his debt with Hometap on or about September 5, 2025.

15. Plaintiff Robert Batchelor is an adult individual and American consumer who resides at 2727 Rosser Road, Bear Creek, North Carolina 27207.

16. Plaintiff Robert Batchelor is a homeowner who entered into an Option Purchase Agreement with Hometap on or about July 15, 2021.

17. Plaintiff Robert Batchelor settled his debt with Hometap on or about December 4, 2023.

18. Plaintiffs Jessica and Edward Arnold (collectively, the "Arnolds") are adult individuals and American consumers who reside at 3624 Table Rock Road, Charlotte, North Carolina 28226.

19. The Arnolds are homeowners who entered into an Option Purchase Agreement with Hometap on or about September 13, 2023, for the property located at 3624 Table Rock Road, Charlotte, North Carolina 28226. The Gross Investment Amount was $159,957.00.

20. Defendant Hometap Equity Partners, LLC ("HEP") is a Delaware Limited Liability Company with its principal offices located at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. HEP is the primary operating entity that facilitates its real estate transactions with consumers.

21. HEP controls the subsidiaries that are the contractual counterparties in transactions entered into by Hometap, such as Hometap HEI Fund IV SPV II, LLC ("SPV II"); and Hometap Investment Partners II, L.P. ("HIP").

22. SPV II is a Delaware Limited Liability Company having an address at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. This entity serves as the secondary investor and assignee for Mr. Bott's home equity investment. SPV II is one of Hometap's special purpose vehicles to which Mr. Bott's Deed of Trust was assigned.

23. HIP is a Delaware Limited Partnership with its principal address located at 75 Arlington Street, Suite 500, Boston, Massachusetts 02116. HIP acted as the original investor and grantee on Plaintiff Batchelor's Deed of Trust and Option Purchase Agreement.

24. HEP, SPV II, and HIP are collectively referred to as "Hometap" herein.

25. At all relevant times, Defendants have engaged in the activities alleged herein in the State of North Carolina.

## FACTUAL ALLEGATIONS

### A. Hometap's HEI Product Structure

26. Hometap's home equity investment ("HEI") contracts are form contracts labeled as Option Purchase Agreements, wherein the homeowner grants Hometap an "option" to purchase a percentage of the homeowner's future interest in the home in exchange for the "Investment Amount" paid immediately to the homeowner.

27. A true and accurate copy of Mr. Bott's Option Purchase Agreement is attached to this Amended Complaint as **Exhibit A.**[1] A true and accurate copy of Mr. Batchelor's Memorandum of Option Purchase Agreement is attached to this Amended Complaint as **Exhibit B.**

---

[1] At the top of this contract, in bold and capitalized letters, is the following statement: "THIS IS NOT A LOAN." Directly below this statement, the contract states: "THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME."

28. Hometap's HEI contracts share several defining characteristics. Each HEI purports to provide the homeowner with an upfront lump sum of cash that it broadly labels as the "Investment Amount," which in sum and substance is the principal of the loan. Hometap typically conducts little to no meaningful credit review or assessment of the homeowner's ability to repay this amount before disbursing the proceeds.

29. Hometap calculates the actual cash disbursement to homeowners by immediately deducting from the Investment Amount its own "Investment Fees," various "Third-Party Costs" for appraisals and title charges, and government taxes. The final, substantially reduced sum that the homeowner receives is defined in the HEI contracts as the "Net Investment Amount" or "Cash Due to Owner."

30. The HEI contracts provide that the standard term of the "Investment" is ten years. Hometap then grants itself the exclusive and unilateral right to extend this term for another ten (and possibly more) years. It goes on that the homeowner does not make monthly or periodic payments during the "Investment Term," but at the end of the ten-year period, extension, or upon any other event that triggers Hometap's right to exercise its option, Hometap may require the homeowner to make a single, full lump-sum payment to Hometap of the total gross investment amount, plus interest and fees due, effectively forcing a payout or the sale of the home. In order to make this payment, homeowners are often forced to sell or refinance their home.

31. Under the terms of the HEI contracts, Hometap grants itself sweeping and unilateral authority to "exercise" its option pursuant to a broad array of triggering events. Not only may Hometap claim its percentage interest upon the traditional sale or transfer of the property and at the expiration of the ten-year term or extension, it also may force payment upon the property's

destruction, a government condemnation, any alleged "Event of Default," or even ambiguously "in anticipation of" the agreement's expiration date.

32. The overly broad definition of "Event of Default" allows Hometap to invoke default on pretextual grounds and facilitates the stripping of homeowners' equity from Plaintiffs and the putative class. Hometap may invoke default unilaterally, not only for standard occurrences like bankruptcy or failing to pay property taxes, but also for highly subjective offenses, such as an alleged failure to maintain the property in "good repair" or the attachment of any unapproved lien.

33. Most egregiously, Hometap embeds a catch-all provision that allows it to declare default upon the occurrence of *any* action or event that Hometap unilaterally claims has a "material adverse effect" on the property's value or Hometap's own financial share.

34. When Hometap invokes default option, it legally acquires an ownership interest in the homeowner's home, which it may use to foreclose or force sale of the home.

35. The HEI contracts define the payout demanded from homeowners as the "Hometap Share," whether upon a voluntary settlement or under a forced exercise option. The amount due is calculated by multiplying the property's final appraised "Ending Home Value" by a variable "Hometap Percentage" that scales aggressively upward (reaching as high as 15.957%) the longer the homeowner remains in the agreement.

36. Hometap also subjects this calculation to a so-called "Hometap Cap," dictating that the homeowner must pay the lesser of the calculated equity share or a 20% annualized rate of return on Hometap's original cash disbursement. Despite its protective sounding language, the Hometap Cap leaves vulnerable consumers on the hook for tens of thousands of dollars while being presented as so-called share equity investments.

## B. Hometap Requires Homeowners to Secure the "Investment" with a Deed of Trust

37. To further secure its "investment," Hometap requires the homeowner to execute a Deed of Trust and Security Agreement. This instrument grants Hometap a security interest in the borrowers' property, along with a unilateral power of sale that permits nonjudicial foreclosure and sale in the event of a deemed breach of the agreement.

38. A true and accurate copy of Mr. Bott's executed Deed of Trust and Security Agreement is attached to this Amended Complaint as **Exhibit C.** A true and accurate copy of Mr. Batchelor's executed Deed of Trust and Security Agreement is attached to this Amended Complaint as **Exhibit D.**

39. The Deed of Trust extends beyond securing Hometap's equity interest. It expressly encumbers the property to ensure payment of amounts that Hometap claims are owed, including liquidated damages, internal legal fees, and the reimbursement of various expenses. It also requires the homeowner to waive statutory homestead protections, thereby subordinating the homeowner's equity to Hometap's lien.

40. The Security Agreement further imposes detailed covenants governing the homeowner's obligations that are similar to a traditional loan. For example, it requires homeowners' sole payment of property taxes and assessments on the "Investment" during the term of the loan. If the homeowner fails to comply, Hometap may pay those amounts, declare a default, and add the expenditures, along with associated fees, to the secured debt.

41. Hometap may also use the Security Agreement to declare default and take possession of the property, seek the appointment of a receiver, or require the homeowner to make payments to remain in the home.

42. Hometap may declare itself as the agent and attorney-in-fact to act as the homeowner with respect to the property, including placing additional encumbrances or facilitating a sale and includes a waiver of all rights of curtesy, dower, and homestead exemptions under North Carolina law. The Security Agreement further provides for the deduction of a trustee's fee and other costs from the sale proceeds before any remaining funds are distributed to the homeowner if Hometap proceeds with a foreclosure under its power of sale.

**C. Bryan Bott Borrowed Money from Hometap**

43. On or about May 28, 2024, Mr. Bott entered into an Option Purchase Agreement with Hometap for his property located at 9316 Ainslie Downs Street, Charlotte, North Carolina 28273 ("Bott Property").

44. Under the terms of Mr. Bott's Option Purchase Agreement, Hometap agreed to pay Mr. Bott an "Investment Amount" of $34,000.00. The "Beginning Home Value" of the Bott Property was determined by Hometap to be $426,144.00.

45. From the $34,000 Investment Amount, Hometap deducted $2,304.00 in fees and costs, resulting in a "Net Investment Amount" paid to Mr. Bott of only $31,696.00. These fees and costs included: (a) an Investment Fee of $1,020.00, kept by Hometap; (b) an Appraisal Fee of $299.00; (c) Title Charges totaling $895.00; (d) a Recording Fee of $64.00, and (e) an Assignment Fee of $26.00. Upon information and belief, Hometap retains all or a portion of these fees.

46. The Investment Fee of $1,020.00 charged by Hometap is approximately 3% of the Investment Amount and thus exceeds the statutory limit for fees on loans of this type under North Carolina law.

47. Under the terms of Hometap's Option Purchase Agreement, the Hometap Percentage is the percentage of the Property's value that Hometap is entitled to receive upon

settlement, which increases over the term of the loan like compounded interest. For Mr. Bott's contract, the Hometap percentage was 11.968% for months 1-36, 14.186% for months 37-72, and 15.957% for months 73-120.

48. According to the Option Purchase Agreement, when the loan was deemed due, Hometap would calculate two different numbers: the Hometap Share and the Hometap Cap. The Hometap Share represents the value of Hometap's interest in the Property based on the Property's actual final value. It is calculated by multiplying the Hometap Percentage by the ending home value. The Hometap Cap represents a 20% annualized rate of return on the Investment Amount.

49. The Option Purchase Agreement states that upon settlement, Mr. Bott will pay whichever of those two numbers is lower, plus the full Investment Amount.

50. For example, if the Property appreciated at an annual rate of 2% and Mr. Bott settles the investment at the end of the 10-year term, the Hometap Share would be approximately $82,891.37. This amount is more than 240% of the $34,000 Investment Amount and more than 260% of the $31,696 amount actually received by Mr. Bott.

51. The Hometap Cap is represented and implied to protect the homeowner against decreases in home value during the term. In reality, this Hometap Cap operates to homeowners' detriment by functioning as a guaranteed 20% annualized rate of return on Hometap's initial investment amount. While Hometap represents that it will share in the risks of a property's depreciation, quarterly statements reveal otherwise. One of Mr. Bott's quarterly statements, for example, demonstrated that even when his home's value decreased from $426,144 to $423,125, Hometap abandoned the equity-share percentage calculation and instead utilized this 20% Hometap Cap to demand an inflated payout.

52. A true and accurate copy of this quarterly statement is attached to this Amended Complaint as **Exhibit E.**

53. Mr. Bott signed his agreement with Hometap at a local Starbucks and never met in person with any Hometap agent or representative. He recalls meeting only with a notary and receiving little to no explanation about what any of the documents meant. When he signed the contract on May 28, 2024, only an agent from the title company, ClearEdge, was present. Mr. Bott had no opportunity to negotiate the terms of the form contracts.

54. Hometap's terms required Mr. Bott to execute a Deed of Trust and Security Agreement that granted Hometap a security interest in his Property. The Deed of Trust form included a "Power of Sale" clause, allowing Hometap as trustee to force a nonjudicial foreclosure sale if Mr. Bott defaults on any obligations under both the option purchase agreement and the Deed of Trust, such as maintaining property insurance, paying property taxes, or maintaining the property in "good repair."

55. In addition, the Deed of Trust required Mr. Bott to assign to Hometap all of his "right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the [Bott] Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to ownership, use, or occupancy of the [Bott] Property." In other words, Hometap also received the rights to any money the Bott Property generates.

56. Hometap then assigned Mr. Bott's Deed of Trust from Hometap Equity Partners, LLC to Hometap HEI Fund IV SPV II, LLC.

### D. Mr. Bott Settled his Hometap "Investment" on or about October 1, 2025

57. Mr. Bott formally requested to settle his "investment" with Hometap through a process called "Owner Repurchase." In response, Hometap sent to Mr. Bott a "Hometap Owner Repurchase Settlement Statement" that demanded a payment of $42,761.41, assuming a settlement date of September 5, 2025. The Settlement Statement provided no explanation as to how Hometap calculated the required settlement payment.

58. A true and accurate copy of Mr. Bott's Hometap Owner Repurchase Settlement Statement is attached to this Amended Complaint as **Exhibit F.**

59. The Settlement Statement also included a schedule showing that the required payment increased every day after September 5, 2025. According to this schedule, the payment would reach $43,385.36 by October 4, 2025.

60. Hometap's statement instructed Mr. Bott to wire the required settlement funds to an account at East West Bank, and it specified that the receiving account belonged to SPV II.

61. Mr. Bott submitted his final payment, and Hometap sent a letter confirming that the Option Purchase Agreement was officially terminated effective October 1, 2025.

62. Once the funds were received, Hometap was obligated to release the liens associated with the investment. On October 7, 2025, an authorized representative for SPV II executed a Certificate of Satisfaction. This document was recorded with the county, at Mr. Bott's cost, to formally discharge the Deed of Trust lien from Mr. Bott's property. A true and accurate copy of this Certificate of Satisfaction is attached to this Amended Complaint as **Exhibit G.**

**E. Robert Batchelor Borrowed Money from Hometap**

63. On or about July 15, 2021, Mr. Batchelor entered into the Option Purchase Agreement with Hometap for his property located at 2727 Rosser Road, Bear Creek, North Carolina 27207 ("Batchelor Property").

64. Under the terms of Mr. Batchelor's Option Purchase Agreement, Hometap agreed to pay Mr. Batchelor an "Investment Amount" of $18,000.00.

65. Hometap required Mr. Batchelor to execute a Deed of Trust and Security Agreement that granted Hometap a security interest in the Batchelor Property. Mr. Batchelor's Deed of Trust included a statutory "Power of Sale" clause, allowing the trustee to force a nonjudicial foreclosure sale if Mr. Batchelor defaults on any obligations under his option purchase agreement or Deed of Trust, including obligations such as maintaining property insurance or paying property taxes.

66. Additionally, pursuant to the Deed of Trust (identical to Mr. Bott's Deed of Trust), Mr. Batchelor agreed to give Hometap the rights to any money the Batchelor property generates.

**F. Mr. Batchelor Settled his Hometap "Investment" in December 2023**

67. Mr. Batchelor formally requested to settle his investment with Hometap through a process called an "Owner Repurchase." As was the response to Mr. Bott, Hometap sent to Mr. Batchelor a "Hometap Owner Repurchase Settlement Statement" that demanded a payment of $27,825.29, assuming a settlement date of December 9, 2023. The Settlement Statement indicated that this amount was only valid for a home value of $250,000.

68. A true and accurate copy of Mr. Batchelor's Hometap Owner Repurchase Settlement Statement is attached to this Amended Complaint as **Exhibit H.**

69. The Settlement Statement also included a schedule showing that the required payment increased every day.

70. Hometap instructed Mr. Batchelor to wire the required settlement funds to an account at Manufacturers & Traders Trust Co/Wilmington Trust, and it specified that the receiving account belonged to Hometap Investment Partners LL LP – Collection Account.

71. Once the funds were received, Hometap was obligated to release the liens associated with Mr. Batchelor's investment. On December 7, 2023, an authorized representative for First American Title Insurance Company (acting as Attorney in Fact for Hometap) executed a Certificate of Satisfaction. This document was recorded with Chatham County on January 23, 2024, to formally discharge the Deed of Trust lien from Mr. Batchelor's property. A true and accurate copy of this Certificate of Satisfaction is attached to this Amended Complaint as **Exhibit I.**

72. Additionally, a Release of Memorandum of Option Purchase Agreement was executed on February 13, 2024, and filed with the county on February 14, 2024.

### G. Hometap's Own Documentation Refers to its Transactions as Mortgage Loans

73. Despite Hometap's bold, capitalized marketing claims that its product "IS NOT A LOAN," the company's own transaction documents explicitly classify the agreement as a traditional mortgage loan.

74. The Borrower(s) Closing Statement for Mr. Bott's Hometap "Investment," for example, definitively categorizes Hometap's $34,000 disbursement under the heading "New Loans" and specifically identifies it as the "Loan Amount." This Closing Statement also assesses a government recording fee specifically for the "Mortgage."

75. A true and accurate copy of this Borrower Closing Statement is attached to this Amended Complaint as **Exhibit J.**

76. This is further reinforced by the Limited Power of Attorney executed at closing, which explicitly identifies the homeowner as a "borrower" and states that the document is signed in consideration for the funding of their "mortgage loan." Importantly, this document also includes

standard lending restrictions, prohibiting the settlement agent from altering the homeowner's "interest rate," the "term of the [homeowner's] loan," or the "outstanding principal balance."

77. A true and accurate copy of Mr. Bott's executed Limited Power of Attorney is attached to this Amended Complaint as **Exhibit K.**

78. Additionally, the Marital Affidavit executed by Mr. Bott and attached to his Option Purchase Agreement explicitly identifies Hometap as "the lender." Hometap also requires the homeowner to sign an Insurance Request form that updates their policy's "Mortgagee clause" to protect Hometap's interest. In its "Investment Disclosures" documents provided to the homeowner, Hometap requires the homeowner to name Hometap as "a loss payee/mortgagee."

79. Finally, when the homeowner pays to settle their Hometap Investment, Hometap's official Owner Repurchase Settlement Statement explicitly notes that the "Mortgage and Security Agreement" will be settled.

**H. Plaintiffs Edward and Jessica Arnold's Active Hometap Investment**

80. On or about September 13, 2023, Plaintiffs Jessica and Edward Arnold entered into an Option Purchase Agreement with Hometap for their primary residence located at 3624 Table Rock Road, Charlotte, North Carolina 28226 ("Arnold Property").

81. A true and accurate copy of the Option Purchase Agreement for the Arnold Property is attached to this Amended Complaint as **Exhibit L.**

82. Under the terms of the Option Purchase Agreement for the Arnold Property, Hometap agreed to pay the Arnolds an "Investment Amount" of $159,957.00. The "Beginning Home Value" of the Arnold property was determined by Hometap to be $895,226.00.

83. Despite taking out an investment of nearly $160,000, the vast majority of this Investment Amount was immediately deducted at closing and was used to directly pay off other

debts the Arnolds owed to Sharonview Federal Credit Union, First Republic Bank, and several USAA accounts. These debt payoffs totaled $123,846.11.

84. At closing, Hometap deducted an additional $6,056.71 in fees and costs, including (a) an Investment Fee (paid to Hometap) of $4,798.71, (b) an "Appraisal Fee to Hometap Equity Partners, LLC" of $299.00, (c) title charges totaling $895.00, and (d) "Recording Fees: Mortgage" totaling $64.00.

85. Accordingly, despite obligating themselves for an Investment Amount of $159,957.00, the Arnolds received a net cash payment of only $30,036.18.

86. The Investment Fee of $4,798.71 charged by Hometap is approximately 3% of the Investment Amount and thus exceeds the statutory limits for fees and loans of this type under North Carolina law.

87. Hometap further required the Arnolds to execute its Deed of Trust and Security Agreement that granted Hometap a security interest in the Arnold Property. A true and accurate copy of this executed Deed of Trust is attached to this Amended Complaint as **Exhibit M.**

88. Pursuant to the Deed of Trust, the Arnolds assigned to Hometap all of their "right, title, and interest in an to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to ownership, use, or occupancy of the Property."

89. To eventually settle the contract, the Arnolds would be required to pay the "Hometap Share," which is calculated by multiplying their home's ending value by a specific "Hometap Percentage." Because the Arnolds took out such a large initial investment, Hometap claims a massive percentage of their home's future value if the property appreciates. For months

1-36, Hometap claims 26.802% of their ending home value; for months 37-72, Hometap claims 31.769% of their ending home value; and for months 73-120, Hometap claims 35.736% of the ending home value. If the home depreciates in value, the percentage locks at 26.802%, regardless of when the Arnolds settle their investment.

90. Hometap also received the right to select an appraiser and thus determine both the beginning home value and the ending home value.

91. The Arnolds' agreement also includes the "Hometap Cap," which limits Hometap's maximum payout to a 20% annualized rate of return of the original $159,957.000 investment amount. The Arnolds are obligated to pay the lesser of the calculated Hometap Percentage or this 20% annualized cap.

92. Because the principal investment amount ($159,957) is so large, the 20% annualized return inflates their debt extremely quickly. According to the Arnolds' Q4 quarterly statement, which covers the period up to December 31, 2025, the Arnolds' estimated value had appreciated such that just over two years into their ten-year term, the Arnolds' settlement cost had already maxed out to the Hometap Cap. In other words, if the Arnolds wanted to settle their agreement at the end of 2025, they would have owed Hometap $242,741.

93. The Arnolds' contract with Hometap remains active and unsettled as of the date of this Amended Complaint. Hometap's Deed of Trust remains recorded. Every day that passes, the Arnolds' potential settlement obligations continue to grow. The Arnolds remain subject to all of the ongoing restrictions and obligations imposed by Hometap, including the obligation to maintain the property in "good repair," pay all property taxes and insurance, refrain from transferring the property, and refrain from taking on additional encumbrances without Hometap's prior written consent.

## I. Hometap Does Not Comply with North Carolina Consumer Lending Laws

94. By deliberately mischaracterizing the transaction as something other than a loan, Hometap attempts to strip homeowners of important statutory lending safeguards while retaining the strict enforcement mechanisms of a traditional debtor-creditor relationship.

95. Upon information and belief, at the time Plaintiffs entered into their respective agreements with Hometap, Hometap was not licensed to originate and/or make mortgage loans in North Carolina.

96. Regardless of how Hometap labels its product, the transaction functions as a mortgage loan because Hometap provides homeowners with an advance of money, receives security through a Deed of Trust on the homeowner's home, and then requires repayment, most often within ten years or less. These features, in the aggregate, create a mortgage loan.

97. While Hometap claims it is not guaranteed repayment, Hometap does ensure that, in practice, it will obtain repayment (plus interest) of its initial advance payment; all of Hometap's "Settlement Events" require the homeowners to pay Hometap.

98. Furthermore, the large discrepancy between how much Hometap pays at the outset and how much it will receive means that Hometap receives thousands of dollars on initiation and will get paid (and make a profit) on the entire Investment Amount, even if the home drops dramatically in value.

99. Despite this guarantee, to further ensure that nothing will decrease the value of the home or jeopardize its future payment, Hometap requires homeowners to ensure that the home is maintained in "good repair" and pay for all the taxes, insurance, and repairs on the home. Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap Cure Payments," which themselves accrue interest at 8% and must be paid back.

### J. Hometap Unlawfully Attempts to Limit Consumers Rights

100. Hometap markets to individuals who need to pay off high-cost debt and who are less likely than the general population to be able to refinance their home at a later date.

101. Prior to signing a Hometap HEI contract, Hometap does not determine whether a homeowner can repay the Hometap HEI based on any documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though a failure to make these payments triggers the homeowner's repayment obligation.

102. Hometap further does not offer or require any counseling prior to inducing homeowners to sign their Option Purchase Agreements.

103. Hometap is a rapidly growing company that has entered transactions with thousands of homeowners across multiple states.

104. The Arnolds and proposed Class members who have active Hometap investments suffer ongoing, daily harm as a result of their active, unsettled Hometap investments.

105. Every day that the Arnolds' investment remains unsettled, the Hometap Share and/or Hometap Cap continues to accrue. Under the 20% annualized Hometap Cap, the amount that the Arnolds will be required to pay Hometap grows each day. This constitutes the ongoing accrual of unlawful interest on what is, in substance, a mortgage loan.

106. The Arnold Property remains encumbered by a Deed of Trust in favor of Hometap. This lien prevents the Arnolds from freely selling, transferring, or refinancing their home without first satisfying Hometap's demands. These ongoing encumbrances restrict the Arnolds' fundamental property rights and prevents them from accessing better financial products.

107. The Arnolds remain subject to extensive ongoing obligations for Hometap's benefit. Their contracts provide that they must maintain their property in "good repair," pay all property taxes, maintain homeowner's insurance naming Hometap as a mortgagee, pay HOA fees, and comply with all local ordinances—all at the Arnolds' expense and for Hometap's financial benefit. Failure to satisfy any of these obligations could trigger a declaration of default and nonjudicial foreclosure.

108. The Arnolds cannot move from or lease their home, take on additional debts or liens, or declare bankruptcy without Hometap's prior written approval. These restrictions fundamentally restrict their personal autonomy and financial freedom.

109. The Arnolds live under the constant threat of Hometap declaring a default based on subjective criteria—including the catch-all "material adverse effect" provision—and exercising its Power of Sale to foreclose on their properties without judicial process.

110. Finally, Hometap controls the appraisal process by selecting or approving the appraiser who will determine the "Ending Home Value" upon settlement. Hometap can also reject a sale if the sale price is less than 90% of Hometap's automated valuation model value. This gives Hometap unilateral control over the financial terms of any settlement.

**K. Hometap's Arbitration Provision is Unenforceable**

111. 15 U.S.C. § 1639c(e)(1) provides that no "residential mortgage loan and no extension of credit under an open-end consumer credit plan secured by the principal dwelling of the consumer may include terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction." *See Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 187 (4th Cir. 2022) (holding that the statute

"precludes pre-dispute agreements requiring the arbitration of claims related to residential mortgage loans").

112. The statute defines "residential mortgage loan" as "any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling." 15 U.S.C. § 1602.

113. Accordingly, because Hometap's transactions constitute residential mortgage loans secured by homeowners' dwellings, its arbitration provision is expressly prohibited by law and is thus void and unenforceable.

## CLASS ALLEGATIONS

114. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following proposed Classes:

> All individuals who entered into an Option Purchase Agreement with Hometap at a time when they were residents of North Carolina and/or where the property that is the subject of the Option Purchase Agreement was located in North Carolina and have settled their investment with Hometap.
>
> All individuals who entered into an Option Purchase Agreement with Hometap at a time when they were residents of North Carolina and/or where the property that is the subject of the Option Purchase Agreement is located in North Carolina and whose investment has not been settled as of the date of this Amended Complaint.

115. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before or after the Court determines whether such certification is appropriate as discovery progresses.

116. **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the Class members are so numerous that joinder of all is impracticable. Upon information and belief

based upon publicly disclosed and available materials, Hometap has entered into hundreds if not thousands of Option Purchase Agreements with North Carolina residents or for properties located in North Carolina.

117. **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. Fed. R. Civ. P. 23(a)(2), (b)(3). The common legal and factual questions include, among others:

a. Whether Hometap's Option Purchase Agreements are mortgage loans;

b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

c. Whether Hometap violated North Carolina usury laws by charging interest rates and fees in excess of statutory limits;

d. Whether Hometap violated the North Carolina Reverse Mortgage Statute;

e. Whether Hometap violated the North Carolina Debt Collection Act;

f. Whether Hometap violated North Carolina mortgage licensing requirements;

g. Whether Hometap engaged in unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1;

h. Whether active, unsettled Class members are entitled to rescission under the Truth in Lending Act;

i. Whether all consumers subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

j. Whether active, unsettled Class members are entitled to injunctive relief enjoining Hometap from enforcing the unconscionable and unlawful terms of its agreements;

k. Whether all consumers subject to Hometap's Option Purchase Agreements, both settled and unsettled, are entitled to statutory, actual, and punitive damages; and

l. Whether Hometap acted willfully, intentionally, and/or recklessly in violating North Carolina's consumer lending laws.

118. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Fed. R. Civ. P. 23(a)(3). Plaintiffs, like all Class members, entered into a standard form Option Purchase Agreement with Hometap containing substantially similar terms and conditions. Plaintiffs' claims arise from the same course of conduct by Defendants and are based on the same legal theories as the claims of all Class members.

119. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in class action litigation to represent themselves and the Class.

120. **Predominance and Superiority.** Questions of law and fact common to the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of this controversy. Fed. R. Civ. P. 23(b)(3).

121. The statutory and punitive damages sought by each Class member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct.

122. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if members of the Class themselves could afford such individual litigation, it would be an unnecessary burden to the courts.

123. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct.

124. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

125. All conditions precedent for filing this Amended Complaint have been satisfied, occurred, or been met. Defendants are also barred by the doctrine of equitable estoppel or equitable tolling from alleging that this action is not timely or that any conditions precedent have not occurred or been met.

## CAUSES OF ACTION

### COUNT I
**Truth in Lending Act ("TILA")**
**15 U.S.C. § 1602 *et seq.***

126. Plaintiffs incorporate by reference each allegation set forth as if set forth at length herein.

127. Despite its representations to the contrary, Hometap's HEI product involves an extension of consumer credit as defined under TILA, 15 U.S.C. § 1635, and Regulation Z, 12 C.F.R. § 226.23.

128. As such, Hometap has violated TILA by failing to provide Plaintiffs with mandatory "material" disclosures prior to or at closing. Specifically, Hometap failed to issue a

compliant TILA disclosure that accurately outlined the loan's true finance charges and failed to disclose other essential credit terms. *See* 15 U.S.C. §§ 1635(i), 1638.

129. Furthermore, although the transaction functioned as the origination of a residential mortgage loan, upon information and belief, Hometap was not licensed to originate mortgage loans in North Carolina at the time the loans in question were originated.

130. In further violation of TILA, Hometap unlawfully embedded a mandatory arbitration provision within its contracts. *See* 15 U.S.C. § 1639(e).

131. Hometap also failed to make a reasonable and good faith determination that Plaintiffs had the ability to repay their individual "Investment Amount."

132. The Arnolds and Class members with unsettled Hometap investments retain the right of rescission under 15 U.S.C. § 1635. Under § 1635(a), a consumer has three business days after consummation of a credit transaction secured by the consumer's principal dwelling to rescind. Under § 1635(f), where the creditor fails to deliver the required material disclosures—including notice of the right to rescind—the rescission period is extended to three years after the date of consummation. *See Lavis v. Reverse Mortg. Sols., Inc.*, 40 F.4th 181, 183 (4th Cir. 2022) ("[I]f a lender fails to deliver the required disclosures—including the right-to-rescind disclosure—the time to rescind is extended to 'three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first.'").

133. Upon rescission, pursuant to 15 U.S.C. § 1635(b), Hometap's security interest in the Arnolds' property becomes void, Hometap must return all money or property given by the Arnolds, and the Arnolds' obligation under the agreements is extinguished.

134. As a direct and proximate result of the aforementioned TILA violations, and pursuant to 15 U.S.C. §§ 1635(i) and 1640, Plaintiffs are entitled to the following damages:

a. Rescission of their transactions and voiding of the security interests;

b. Release and discharge of all Deeds of Trust recorded against Plaintiffs' properties;

c. Termination of any security interest in Plaintiffs' properties created under the transaction;

d. Return of any money or property given by Plaintiffs to anyone, including Hometap, in connection with these transactions;

e. Actual and statutory damages; and

f. An award of reasonable attorneys' fees and costs.

## COUNT II
## North Carolina Usury Law
## N.C. Gen. Stat. § 24-1 *et seq.*

135. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

136. Hometap's Option Purchase Agreement is, in substance, a loan secured by real property under North Carolina law. A "high-cost home loan" is defined as a loan other than a reverse mortgage loan in which (1) the principal amount of the loan does not exceed $300,000, (2) the borrower is a natural person, (3) the debt is primarily for personal, family, or household purposes; and (4) the loan is secured by either a security interest in borrower's principal dwelling or a mortgage or deed of trust on a home that does or will serve as the borrower's principal dwelling. N.C. Gen. Stat. § 24-1.1E(a)(4) (2025).

137. Under N.C. Gen. Stat. § 24-10(a), a lender making a "high-cost home loan," or a loan with a principal amount under $300,000 that is secured by real property cannot charge fees that exceed 1% of the principal amount of the loan.

138. Furthermore, N.C. Gen. Stat. § 24-10(g)(1) provides that for loans with a principal amount exceeding $25,000 that "are secured by a second or junior lien on real property," lenders may not charge fees that exceed 2% of the principal amount.

139. Hometap regularly charges an "Investment Fee" that is approximately 3% of the "Investment Amount." Hometap's "Investment Fee" charged to Mr. Bott, for example, was $1,020.00 on Mr. Bott's $34,000 Investment Amount. This 3% fee far exceeds the statutory limits.

140. Additionally, pursuant to N.C. Gen. Stat. § 24-1.1E(b)(2), "[n]o high-cost home loan may contain a scheduled payment that is more than twice as large as the average of earlier scheduled payments."

141. Mr. Bott's Hometap agreement, for example, requires a single lump-sum payoff to settle the Hometap Share at the end of the 10-year option (or upon sale of the Bott Property), with no prior scheduled monthly payments. This constitutes an illegal balloon payment in violation of the above-cited provision.

142. As a direct and proximate result of Defendants' violations of the aforementioned statutes, Plaintiffs have suffered damages, including the payment of unlawful fees and the ongoing accrual of unlawful fees and interest under their active agreements.

143. Plaintiffs seek damages, costs, attorneys' fees, and such other relief as is equitable and just.

## COUNT III
## North Carolina Reverse Mortgage Act
## N.C. Gen. Stat. Ch. 53, Art. 21

144. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

145. Hometap's Option Purchase Agreement functions as a reverse mortgage under North Carolina law because it involves an advance of funds to homeowners secured by their residential property, with repayment deferred until the end of a specified term or upon the occurrence of certain triggering events. *See* N.C. Gen. Stat. § 53-257(6) (2025). North Carolina's Reverse Mortgage Act is designed to allow elderly homeowners to access the equity in their homes to meet their financial needs. *Id.* § 53-256 (2025).

146. Under N.C. Gen. Stat. § 53-270.1, a lender and borrower may agree that in addition to the principal and any interest accruing on the outstanding balance of a reverse mortgage loan, the lender may receive shared appreciation, but only if such shared appreciation "is in an amount not exceeding ten percent (10%) of the increase in the value of the property from the date of origination of the reverse mortgage loan to the date of loan repayment. . . ."

147. Hometap's agreements require all borrowers to surrender a "Hometap Percentage" of anywhere from approximately 12% to 47% of the ending home value to settle the investment. These percentages far exceed the 10% statutory maximum for shared appreciation under the North Carolina Reverse Mortgage Statute.

148. Additionally, N.C. Gen. Stat. § 53-270 lays out several prohibited practices in the offering and structuring of a reverse mortgage. The statute prohibits "[m]isrepresenting material facts, making false promises, or engaging in a course of misrepresentation through agents or otherwise" as well as "[e]ngaging in any action or practice that is unfair or deceptive." N.C. Gen. Stat. §§ 53-270(1), (4) (2025). The statute also prohibits closing a reverse mortgage loan without first receiving certification from a state-approved reverse mortgage counselor ensuring that the borrower was advised on the financial impacts and tax consequences of the transaction. *Id.* § 53-270(6) (2025).

149. There is no provision in the Hometap agreement that requires or provides this mandatory independent counseling. Furthermore, upon information and belief, Hometap did not require Plaintiffs to talk to an approved counselor, nor did Hometap receive proof of Plaintiffs counseling prior to closing on its disguised reverse mortgage loans with Plaintiffs.

150. As a direct and proximate result of Defendants' violations of the North Carolina Reverse Mortgage Statute, Plaintiffs have suffered damages.

151. Plaintiffs are entitled to all remedies available under N.C. Gen. Stat. Ch. 53, Art. 21, including but not limited to damages, costs, attorney's fees, and such other relief as is equitable and just.

**COUNT IV**
**North Carolina Debt Collection Act**
**N.C. Gen. Stat. Ch. 75, Art. 2**

152. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

153. To the extent the "Settlement Amount" owed by Hometap consumers constitutes a debt as defined under North Carolina law, Hometap's practices in connection with the collection of such amounts due violate the North Carolina Debt Collection Act ("NCDCA"). *See* N.C. Gen. Stat. § 75-50(2) (2025) (defining "debt" as "any obligation owed or due or alleged to be owed or due from a consumer").

154. To state a valid claim under the NCDCA, the plaintiff must establish, among other things, that the one owing the obligation is a consumer. *See Reid v. Ayers*, 138 N.C. App. 261, 263 (2000); *see also* N.C. Gen. Stat. § 75-50(1) (2025). The NCDCA defines "consumer" as "any natural person who has incurred a debt or alleged debt for personal, family, household, or agricultural purposes." *Id.*

155. Plaintiffs satisfy the NCDCA definition of "consumer" because they, individually, used the money loaned to them by Hometap for personal, family, or household purposes.

156. Under N.C. Gen. Stat. § 75-54(4), a debt collector is prohibited from falsely representing the "character, extent, or amount of a debt against a consumer."

157. Hometap's persistent representation of the debt as an "investment" rather than a loan constitutes a deceptive representation of the debt's true character, in clear violation of this provision.

158. Additionally, pursuant to N.C. Gen. Stat. §§ 75-51(6) and (8), a debt collector may not threaten to take any action not permitted by law, nor represent that nonpayment will result in seizure, garnishment, attachment, or sale of any property unless such action is in fact contemplated and permitted by law.

159. The Hometap Deed of Trust asserts that upon an event of default, Hometap may declare all secured obligations "immediately due," and Hometap may at any time without notice and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the property. Threatening this type of immediate, self-help seizure in the contract constitutes threatening an action not permitted by law.

160. Under N.C. Gen. Stat. § 75-55(2), it is an unconscionable debt collection practice to collect or attempt to collect "any interest or other charge, fee, or expense incidental to the principal debt unless legally entitled to such fee or charge."

161. Because the Hometap contract charges fees upfront that include, among others, a Hometap Investment Fee that exceeds the statutory limits for such fees under N.C. Gen. Stat. §§ 24-10(a) and 24-10(g)(1), attempting to collect these amounts constitutes an unconscionable debt collection practice.

162. As a direct and proximate result of Defendants' violations of the North Carolina Debt Collection Act, Plaintiffs have suffered damages.

163. Plaintiffs are thus entitled to all remedies available under N.C. Gen. Stat. Ch. 75, Art. 2, including actual damages, statutory penalties, and attorneys' fees.

## COUNT V
## North Carolina Mortgage Law
## N.C. Gen. Stat. Ch. 45

164. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

165. Under N.C. Gen. Stat. § 45-36.7, a payoff statement provided by a secured creditor must contain specific financial disclosures, including "the amount by type of each fee, charge, or other sum included within the payoff amount" as well as "[t]he information reasonably necessary to calculate the payoff amount as of the requested payoff date, including the per diem interest amount." N.C. Gen. Stat. § 45-36.7(e)(1)-(2) (2025).

166. Upon information and belief, when Plaintiffs and Class members have requested or will request to settle their investments, Hometap provides an "Owner Repurchase Settlement Statement" that violates these statutory requirements by failing to itemize the components of the payoff figure, failing to state the per diem interest amount, and failing to provide the formula used to calculate the daily schedule. For Mr. Bott, for example, the document demands a flat "Settlement Amount" of $42,761.41 and provides a table showing the total amount increasing each day, but it entirely fails to itemize the components of this payoff figure.

167. As a direct and proximate result of Defendants' violations of the aforementioned provisions, Plaintiffs have suffered damages.

168. Plaintiffs are thus entitled to all remedies available under N.C. Gen. Stat. Ch. 45, including damages and attorneys' fees.

**COUNT VI**

**North Carolina Secure and Fair Enforcement ("SAFE") Mortgage Licensing Act**
**N.C. Gen. Stat. Ch. 53, Art. 19B**

169. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

170. North Carolina's SAFE Act is the state's mortgage licensing and conduct law, requiring anyone who originates residential mortgage loans in North Carolina to be properly licensed and to follow strict consumer protection rules. Specifically, the Act prohibits any company from engaging in the mortgage business—which includes advancing funds on residential mortgage loans for compensation or gain—without first obtaining and maintaining a proper license under Article 19B. N.C. Gen. Stat. § 53-244.040(a) (2025).

171. North Carolina law also requires anyone engaged in the mortgage business to clearly show their Nationwide Mortgage Licensing System ("NMLS") "unique identifier" on all residential mortgage loan applications, solicitations, advertisements, and other documents. N.C. Gen. Stat. § 53-244.107 (2025).

172. Upon information and belief, at the time Hometap entered into its agreements with Plaintiffs, Hometap did not hold the proper license to engage in mortgage lending in North Carolina. Also upon information and belief, Hometap does not display any NMLS identifier on its documents.

173. Furthermore, under N.C. Gen. Stat. § 53-244.111(5), it is unlawful for any person in a residential mortgage loan transaction to charge or collect any fee or rate of interest that is contrary to the limits set by Chapter 24.

174. Hometap charges fees and interest rates that exceed statutory limits under Chapter 24, as set forth in Count II above.

175. Additionally, under N.C. Gen. Stat. §§ 53-244.111(1) and (8), it is prohibited in any residential mortgage loan transaction to misrepresent or conceal material facts, or to engage in any course of business that is not in good faith or fair dealing, or that constitutes fraud upon any person.

176. Hometap's repeated representations that its HEI product is "not a loan" constitutes a misrepresentation or concealment of material facts in violation of this provision.

177. As a direct and proximate result of Defendants' violations of the NC SAFE Act, Plaintiffs have suffered damages.

178. Plaintiffs are thus entitled to all remedies available under the Act, including damages, penalties, and attorneys' fees.

**COUNT VII**
**North Carolina Unfair and Deceptive Trade Practices ("UDTPA")**
**N.C. Gen. Stat. § 75-1.1**

179. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

180. N.C. Gen. Stat. § 75-1.1 prohibits unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.

181. To assert a North Carolina UDTPA claim, a plaintiff must show that: "(1) the defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." *Wells Fargo Bank, N.A. v. Corneal*, 238 N.C. App. 192, 195-96 (2014) (citation omitted); *see also* N.C. Gen. Stat. § 75-1.1 (2025). "A practice is properly deemed unfair when it offends established public policy as

well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 196 (citation omitted).

182. Hometap has engaged in several unfair and deceptive trade practices, including but not limited to:

a. Misrepresenting the HEI product as "not a loan" when it functions as a loan under North Carolina law;

b. Attempting to enforce a contract that relies on a scheme in violation of North Carolina interest rate and fee limitations;

c. Failing to comply with North Carolina usury laws, reverse mortgage statutes, debt collection laws, and mortgage licensing requirements, among others;

d. Including misleading, confusing, and deceptive terms in its standard form contracts;

e. Requiring homeowners, including Plaintiffs, to waive substantial legal rights, including the right to a jury trial and the right to participate in class action litigation, without adequate disclosure;

f. Marketing its product to vulnerable consumers without properly assessing their ability to repay; and

g. Continuing to send quarterly statements to active investment holders that perpetuate the deception about the nature of the product; thereby concealing consumers' rights under federal and state consumer lending laws.

183. Because Hometap operates a for-profit enterprise that exchanges capital for secured property interests and charges associated fees, Hometap's acts and practices constitute "business activities" that are in or affecting commerce under N.C. Gen. Stat. § 75-1.1.

184. Hometap's violations of TILA, North Carolina usury laws, the North Carolina Reverse Mortgage Act, the North Carolina Debt Collection Act, the NC SAFE Act, and North Carolina mortgage law, as alleged herein, constitute per se violations of the UDTPA. *See State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630 (2005); *Gilbert v. Residential Funding LLC*, 678 F.3d 271 (4th Cir. 2012).

185. As a direct and proximate result of Hometap's unfair and deceptive trade practices, Plaintiffs have suffered ascertainable losses and damages. Plaintiffs are thus entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16, as well as attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

**COUNT VIII**
**Declaratory Relief – Fee Shifting Provision Unenforceable**
**28 U.S.C. § 2201**

186. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

187. Plaintiffs' executed Deeds of Trust contain a broad and one-sided "Attorneys' Fees" provision that requires the homeowner to pay all costs, fees, and expenses incurred by Hometap in connection with interpreting, administering, or enforcing the agreement. This provision is not limited to litigation costs but extends to any dispute-related expenses and in-house counsel disbursements.

188. Additionally, the Hometap Option Purchase Agreement also includes a provision that requires the homeowner to "pay any reasonable fees imposed or incurred by [Hometap] from time to time related to the Option during the Effective Period." The provision explicitly states that the homeowner is required to pay any fees incurred in "any dispute relating to the Property."

189. These fee-shifting provisions are procedurally and substantively unconscionable, against public policy, and unenforceable. They are presented on a take-it-or-leave-it basis within adhesive consumer contracts and are designed to deter borrowers from vindicating their rights under consumer protection laws.

190. There exists an actual dispute between the parties concerning whether Plaintiffs would be responsible for paying Hometap's attorneys' fees in the event that Hometap prevails in the present action. A judicial declaration is necessary because the stakes are substantial; attorneys' fees in litigation of this nature routinely reach tens or hundreds of thousands of dollars.

191. Plaintiffs seek a declaration that this fee-shifting provision is unconscionable and unenforceable in this action.

## COUNT IX
### Unconscionability
### North Carolina Common Law

192. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

193. As set forth herein, the Option Purchase Agreement and accompanying Deed of Trust together form an unconscionable contract of adhesion.

194. Hometap is a large financial company engaged in the business of soliciting homeowners and placing them into complex, equity-stripping agreements. Plaintiffs and Hometap occupied significantly unequal bargaining positions.

195. Hometap drafted all documents—including those with dense, complex legal and financial terms—and presented them to Plaintiffs on a "take it or leave it" basis, which constitutes a contract of adhesion. Furthermore, Hometap provided no meaningful explanation of the documents to Plaintiffs; Plaintiffs were simply instructed to sign.

196. The terms of the Option Purchase Agreement and Deed of Trust are substantially one-sided in favor of Hometap. Hometap drafted the terms, such that they would guarantee Hometap a high rate of return at very limited risk, while placing an oppressive burden of costs and risks on Plaintiffs. This unconscionability is evidenced by (including but not limited to) the following:

a. Structuring the transaction to ensure Hometap reaps massive profits while requiring Plaintiffs to bear all costs in order to protect and increase that profit, including the payment of all property taxes, insurance, and maintenance.

b. Granting Hometap an irrevocable Power of Attorney to unilaterally encumber the property with new loans, or sell and convey the entire interest in the property upon an alleged default.

c. Empowering Hometap to physically enter and take possession of the property without a court order upon an alleged default and demanding that Plaintiffs pay "Fair Rental Payments" to Hometap just to remain occupying their own home.

d. Forcing Plaintiffs to waive fundamental rights, including explicitly waiving all statutory homestead protections under North Carolina law and waiving the right to a jury trial or class action through a mandatory arbitration agreement.

e. Disguising an exorbitant, high-cost mortgage loan as a shared equity "Option" to circumvent and evade state and federal lending disclosures and consumer protection laws.

197. Because the transaction was unconscionable at the time it was made and induced by unconscionable conduct, Plaintiffs are entitled to, and respectfully request, all appropriate relief

pursuant to the common law contract defense of unconscionability, including a declaration that the Option Purchase Agreement and Deed of Trust are void and unconscionable.

**COUNT X**
**Fraud in the Inducement**
**North Carolina Common Law**

198. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

199. Under North Carolina law, fraud in the inducement allows a party to challenge a contract's validity when fraudulent misrepresentations induce them to enter into the agreement.

200. Hometap made materially false representations with the intent to deceive Plaintiffs into signing the Option Purchase Agreement. Specifically, Hometap explicitly designed its primary contract to deceive Plaintiffs regarding the fundamental nature of the transaction. By misrepresenting to Plaintiffs that its HEI product was "not a loan," Hometap fraudulently induced Plaintiffs to believe that they were simply entering into a home-equity sharing option. Hometap also represented the transaction as a simple "Option Purchase Agreement," but secretly restricted Plaintiffs with the severe obligations and threats consistent with a traditional mortgage lender.

201. Additionally, Hometap fraudulently represented to Plaintiffs the true amount of money that they would receive. Hometap represented to Mr. Bott, for example, that his "Investment Amount" was $34,000. This, however, was a misleading representation of the actual cash benefit he would receive, as Mr. Bott's "Net Investment Amount" ended up being $31,696.

202. Furthermore, Hometap's Investment Disclosures deceived Plaintiffs by framing its "Hometap Cap" feature as a consumer safeguard. In reality, this "Cap" operated to Plaintiffs' detriment by functioning as a guaranteed 20% annualized rate of return on Hometap's initial disbursement. For example, quarterly statements revealed that even when Mr. Bott's home

depreciated in value, Hometap abandoned the equity-share percentage calculation and instead utilized the 20% Hometap Cap to demand an inflated payout.

203. As a result of these fraudulent misrepresentations, Plaintiffs justifiably relied on these representations to their detriment.

204. When fraud in the inducement is established, "the remedies are either to repudiate the contract or affirm the contract and recover damages caused by the fraud." *Collier v. Bryant*, 216 N.C. App. 419, 434 (2011) (citation omitted). However, "if rescission of the contract does not place the injured party *in statu quo*, as where he has suffered damages which cancellation of the contract cannot repair, there is no principle of law which prevents him from maintaining his action for damages caused by the other party's fraud." *Id.* (citation omitted).

205. As a direct and proximate result of Hometap's fraudulent misrepresentations, Plaintiffs have suffered ascertainable losses and damages. Plaintiffs are thus entitled to all remedies available under North Carolina law including recission.

## COUNT XI
**Unjust Enrichment**
**North Carolina Common Law**

206. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

207. Under North Carolina law, unjust enrichment is an equitable doctrine designed to prevent one party from being unjustly enriched at another's expense when no valid contract governs their relationship.

208. The economic benefits derived by Hometap are a direct and proximate result of Hometap's unlawful and inequitable acts, as alleged in this Amended Complaint. Hometap has been enriched by the Investment Fees charged at closing, the ongoing appreciation of its secured

interest in Plaintiffs' properties, and the benefit of Plaintiffs' ongoing maintenance, tax, and insurance payments that preserve and enhance the value of Hometap's interest.

209. Plaintiffs are entitled to all remedies available under North Carolina law, including all payments made by Plaintiffs to Hometap resulting from inequitable and unlawful acts. It would be inequitable and unjust for Hometap to retain any portion of the charges, costs, principal, interest, and other costs resulting from Hometap's inequitable and unlawful acts.

## COUNT XII
## Breach of the Implied Covenant of Good Faith and Fair Dealing
## North Carolina Common Law

210. Plaintiffs incorporate by reference each allegation set forth as if set forth at length herein.

211. Under North Carolina law, every contract contains an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

212. Hometap's Option Purchase Agreements and Deeds of Trust vest substantial discretion in Hometap in the ongoing administration of the agreements, including but not limited to: (a) the determination of whether a "material adverse effect" has occurred; (b) the selection or approval of appraisers; (c) the decision to reject or approve property sales; (d) the determination of whether the property is maintained in "good repair"; (e) the decision to extend the Investment Term; and (f) the decision to declare an Event of Default.

213. Hometap has breached and continues to breach this implied covenant of good faith and fair dealing by exercising its discretion under these agreements in bad faith and in a manner designed to maximize Hometap's financial return at the expense of Plaintiffs and the Class. Specifically, Hometap:

a. Uses its control over the appraisal process to inflate property valuations and thereby increase the Hometap Share owed by homeowners;

b. Retains the unilateral right to reject sales at prices below 90% of Hometap's own automated valuation, even when such sales represent fair market value;

c. Sends quarterly statements that perpetuate the false characterization of the transaction, thereby preventing homeowners from understanding and exercising their legal rights;

d. Threatens default and foreclosure based on subjective, catch-all provisions that give Hometap virtually unlimited discretion; and

e. Exercises its contractual discretion in a manner designed to trap homeowners in their agreements and prevent them from settling on fair terms.

214. As a direct and proximate result of Hometap's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and continue to suffer damages.

## COUNT XIII
## Injunctive Relief

215. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

216. The Arnolds and Class members with unsettled investments face an imminent threat of irreparable harm absent injunctive relief. Hometap continues to enforce the unconscionable and unlawful terms of its Option Purchase Agreements and Deeds of Trust against the Arnolds and the Class on a daily basis.

217. Specifically, Hometap continues to: (a) accrue the Hometap Share and Hometap Cap against the Arnold Property; (b) maintain a recorded Deed of Trust that encumbers the Arnold Property and restricts their ability to sell, transfer, or refinance; (c) demand ongoing compliance

with property maintenance, tax, and insurance obligations; (d) threaten default and nonjudicial foreclosure under its Power of Sale; and (e) restrict the Arnolds' ability to rent, encumber, or otherwise freely use their own property.

218. These ongoing harms cannot be adequately compensated by money damages alone. The threat of losing one's home through nonjudicial foreclosure, the restriction of fundamental property rights, and the continuing accrual of unlawful interest constitute irreparable injury.

219. The balance of equities tips sharply in favor of the Arnolds and the Class. Hometap has no legitimate interest in enforcing contracts that violate federal and state law. In contrast, the Arnolds face the loss of their property and the ongoing restriction of their fundamental property rights.

220. The Arnolds respectfully request that this Court enter a preliminary and permanent injunction on their behalf and on behalf of the Class with unsettled investments:

a. Enjoining Hometap from exercising its option, declaring defaults, or initiating foreclosure proceedings under the Option Purchase Agreements and Deeds of Trust of the Arnolds and Class members during the pendency of this action;

b. Enjoining Hometap from enforcing any of the unconscionable provisions of the agreements, including the mandatory arbitration clause, class action waiver, and fee-shifting provisions;

c. Requiring Hometap to provide the Arnolds and Class members with corrective disclosures identifying the true nature of the transaction as a mortgage loan and informing them of their rights under federal and state consumer lending laws; and

d. Ordering Hometap to release and discharge all Deeds of Trust recorded against the properties of the Arnolds and Class members.

## COUNT XIV
**Declaratory Judgment**
**28 U.S.C. § 2201**

221. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

222. An actual controversy exists between Plaintiffs and the Class, on the one hand, and Defendants, on the other hand, concerning the legal characterization of Hometap's Option Purchase Agreements and the rights and obligations of the parties thereunder.

223. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and North Carolina law declaring that:

a. Hometap's Option Purchase Agreements constitute mortgage loans under North Carolina law;

b. Hometap's Option Purchase Agreements are subject to North Carolina usury laws and other consumer lending statutes;

c. The interest rates and fees charged by Hometap exceed statutory limits and are thus unlawful;

d. The mandatory arbitration clause, class action waiver, and jury trial waiver in Hometap's contracts are unenforceable;

e. Plaintiffs and Class members are entitled to rescission of their Option Purchase Agreements under 15 U.S.C. § 1635; and

f. All Deeds of Trust recorded in connection with Hometap's Option Purchase Agreements are void and must be released.

224. A declaratory judgment is necessary and appropriate to determine the respective rights and obligations of the parties and to provide guidance for future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully ask this Court to award judgment against Defendants as follows:

1. Certify this case as a class action under Rule 23 on behalf of the proposed classes and designate Plaintiffs as class representatives and their counsel as class counsel;
2. Find that Defendants have committed the violations of law alleged herein;
3. Enter an order rescinding the Option Purchase Agreements of Plaintiffs and all Class members and declaring said agreements void ab initio;
4. Order the immediate release and discharge of all Deeds of Trust recorded against the properties of Plaintiffs and Class members;
5. Issue a declaratory judgment that Hometap's Option Purchase Agreements constitute mortgage loans subject to all applicable federal and state consumer lending laws;
6. Issue a preliminary and permanent injunction enjoining Hometap from enforcing, exercising options under, declaring defaults under, or initiating foreclosure proceedings pursuant to the Option Purchase Agreements and Deeds of Trust;
7. Issue an order awarding restitution and monetary damages to the Class;
8. Render an award of compensatory damages, the exact amount of which is to be determined at trial;
9. Render an award of treble damages;
10. Render an award of punitive damages;
11. Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and
12. Grant all other such relief as the court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand trial by jury as to all issues in the above matter.

Date: August 21, 2026

BRYSON HARRIS SUCIU & DEMAY, PLLC

*/s/ Scott C. Harris*
Scott C. Harris
N.C. Bar No. 35328
Lynn M. Johnson
N.C. Bar No. 62465
900 W. Morgan Street
Raleigh, NC 27603
Tel: 919-600-5003
sharris@brysonpllc.com
ljohnson@brysonpllc.com

Anne T. Regan *(to be admitted pro hac vice)*
HELLMUTH & JOHNSON, PLLC
8050 West 78th Street
Edina, Minnesota 55439
Tel: 952-941-4005
aregan@hjlawfirm.com

*Attorneys for Plaintiffs and Putative Class*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing AMENDED COMPLAINT was filed using the CM/ECF document filing service which will electronically send notice of the filing to counsel on record.

Date: August 21, 2026

BRYSON HARRIS SUCIU & DEMAY, PLLC

*/s/ Scott C. Harris*
Scott C. Harris
sharris@brysonpllc.com